IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
No. 3:05CV346-1-MU

| | |
|---|---|
| RAE LAMAR WIGGINS a/k/a, | ) |
| RAE CARRUTH, | ) |
| | ) |
| *Petitioner*, | ) |
| | ) |
| vs. | ) |
| | ) |
| BONNIE BOYETTE, | ) |
| | ) |
| *Respondent*. | ) |

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

NOW COMES Rae Lamar Wiggins a/k/a Rae Carruth, by and through his undersigned counsel, and responds to the motion for summary judgment filed by respondent. This Court should not grant summary judgment in this matter because disputed issues of material facts exist on various issues that renders summary judgment inappropriate. Fed. R. Civ. P. 56(c) (summary judgment appropriate only where "there is no genuine issue as to any material fact"). Conflicts in material facts that can only be resolved by an evidentiary hearing. Thus, summary judgment is inappropriate. *Hunt v. Cromartie*, 526 U.S. 541, 541-42 (1999). Respondent's motion must be denied.

In further support of this response, Carruth shows the following:

## REASONS WHY SUMMARY JUDGMENT MUST BE DENIED

Rae Carruth is entitled to a writ of habeas corpus as a matter of law and fact because his convictions and his sentences were imposed in violation of various federal constitutional rights. In denying Carruth relief, the state courts made determinations that involved the unreasonable application of established federal law. As more fully set forth below, this Court should not defer to the rulings of the state courts on these important constitutional issues and must issue a writ of habeas corpus.

## CLAIM ONE: THE STATE COURT UNREASONABLY APPLIED CLEARLY ESTABLISHED FEDERAL LAW IN REJECTING THE CLAIM THAT THE PROSECUTORS DISCRIMINATED AGAINST PROSPECTIVE AFRICAN-AMERICAN JURORS, PARTICULARLY AFRICAN-AMERICAN MEN, IN THEIR PEREMPTORY CHALLENGES.

A prosecutor cannot constitutionally exercise peremptory challenges on the basis of race. *See Batson v. Kentucky,* 476 U.S. 79(1986); U.S. Const. Amend. XIV. Rae Carruth challenged, at trial and on appeal, the prosecutors' discriminatory use of their peremptory challenges to remove otherwise qualified African-Americans, particularly African-American men, from the venire. These challenges were unsuccessful despite the strong statistical showing that race was a criterion the prosecutors used for excusing several prospective African-American juror. *See Wilson v. Beard*, 426 F.3d 653669-70 (3d Cir. 2005) (affirming habeas relief for *Batson* violation where prosecutor's recording of juror's race indicative of pretextaul nature of allegedly race-neutral explanations). *Batson* is violated where race-neutral reasons are so intertwined with race-based reasons so as to demonstrate a racially

2

motivated basis for the challenge. *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) (*Miller-El II*); s*ee also Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir. 1995) (holding if prosecutor exercised peremptory challenge partially for discriminatory purpose, trial court must decide if he demonstrated the strike would nevertheless have been exercised if improper factor not involved); *accord Kesser v. Cambra*, 465 F.3d 351, 373-375 (9th Cir. 2006) (en banc) (Wardlaw, J., concurring) (surveying cases and finding state court acted unreasonably in not applying mixed-motive analysis under *Batson*).

Carruth's constitutional rights were violated if race was one of the reasons for which the prosecutors removed an African-American from jury service. *See Moore v. State*, 811 S.W.2d 197, 200 (Tex. Cr. App. 1991) (race-neutral reasons will not save strike if race was one reason behind it). The state courts rejected this claim through a misapplication of clearly established federal law and an unreasonable determination of the facts presented in state court. *See* 28 U.S.C. § 2254(d)(1) & (2). Thus, this Court must issue a writ of habeas corpus.

A.     **The North Carolina Court of Appeals Unreasonably Applied the Basic Standards of *Batson* and its Progeny.**

The North Carolina Court of Appeals rejected the issue on direct appeal by unreasonably applying clearly established federal law. For example, the court refused to engage in a comparative analysis of excused African-American venire members with similarly situated white venire members who were accepted by the prosecutors in deciding if the reasons given by the prosecutors were pretextual. *Wiggins*, 159 N.C. App. at 263-64, 583 S.E.2d at 312. The Court of Appeals considered only (1) the race of the key actors, (2)

questions during voir dire indicative of discrimination, (3) frequency of challenges to African-Americans, (4) whether the prosecutors exhausted their peremptory strikes, and (5) the ultimate makeup of the jury. Through its own analysis, it did not consider the disparate treatment of similarly situated white prospective jurors vis-a-vis African-American prospective jurors.[1] *Id*. at 265, 583 S.E.2d at 313. Yet "side-by-side comparisons" of similarly situated African-American and white prospective jurors is a major consideration in the *Batson* analysis. *Miller-El II*, 545 U.S. at 241; *accord Snyder v. Louisiana*, 128 S.Ct. 1203, 1211 (2008). Thus, it was "contrary to, or involved an unreasonable application of, clearly established federal law" to ignore the treatment of similarly situated white prospective jurors under section 2254(d)(1).

Respondent suggests the Court of Appeals "recognized the proper standards for its analysis and appropriately applied those circumstances to the circumstances of this case." [Respondent's Supporting Brief at 18] But this conclusory statement is belied by the language of the Court of Appeals itself. The Court of Appeals never mentions a side-by-side comparison of similarly situated prospective jurors except to recognize that Carruth "argued at trial that other non-black jurors were not challenged despite being equivocal about the death

---

[1]    Respondent says Carruth did not argue side-by-side comparisons in his brief to the North Carolina Court of Appeals. Aside from being irrelevant to whether the state court unreasonably applied established federal law, this position is also wrong. At pages 29 and 30 of his brief to the state court of appeals, Carruth specifically identified numerous white prospective jurors who had the same characteristics as African-American prospective jurors, where those characteristics formed the basis of the prosecutor's explanations for his peremptory challenges to the African-Americans. Carruth also made these specific arguments to the state trial court when he made his *Batson* objections. (11/07/00 Tpp. 138-160)

4

penalty, articulating a higher standard of proof, having children who were defendant's age, or having had contact with some of the witnesses." *Wiggins*, 159 N.C. App. at 264, 583 S.E.2d at 313. Thus, although the Court of Appeals acknowledged that Carruth identified similarly situated African-American prospective jurors who were treated differently by the prosecutors than their white counterparts, it did not give this disparate treatment any weight in its *Batson* analysis. Rather, it said the only evidence in this case that gave rise to even an inference of discrimination was the numerical disparity.[2] *Id*. at 266, 583 S.E.2d at 314. In this regard, the decision is an unreasonable application of *Batson* and its progeny.

**B.  The North Carolina Court of Appeals Unreasonably Failed to Give Appropriate Weight to the Statistical Disparities Between Challenges to African-Americans and White Prospective Jurors.**

At Carruth's trial, the prosecutors struck six out of nine of the African-American prospective jurors who had not been excused for cause, a rejection rate of almost 73 percent. By contrast, the prosecutors struck white prospective jurors who had not been excused for cause at a rate of only 13 percent. This effort by the prosecutors resulted in a jury of twelve on which merely three members of Carruth's race participated. The prosecutors used a far greater percentage of its peremptory challenges against African-Americans than whites. This disparity itself raises an inference of discrimination. *Batson*, 476 U.S. at 94-95. Yet the state

---

[2]       Respondent urges this Court to defer to the state court of appeals because Carruth showed nothing but the statistical disparities between the use of peremptory strikes against African-American and white prospective jurors. [Respondent's Supplemental Brief at 35] This deference would be misplaced, as Carruth showed other indicia of discrimination, such as the disparate treatment of similarly situated prospective jurors. Respondent also argued the showing in *Miller-El* was more pronounced. However, Carruth's discovery request was denied.

5

court defiantly ignored these percentages. *Wiggins*, 159 N.C. App. at 265-66, 584 S.E.2d at 313-14. Rather, the Court of Appeals placed greater weight on the prosecutors' "failing to exercise all of its fourteen peremptory challenges", *id*. at 265, 584 S.E.2d at 313, which is simply irrelevant. It takes only one discriminatory peremptory strike to violate *Batson*.

Moreover, the state court's treatment of the statistical evidence itself was unreasonable, as these numbers are significant. *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003) (*Miller-El I*). In *Miller-El I*, the prosecutor struck ten of eleven (91%) otherwise qualified African-Americans. He challenged only four of thirty-one (13%) eligible whites. This "statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors." *Id*. at 343. The sheer numbers gave rise to discrimination because "[h]appenstance is unlikely to produce this disparity." *Id*. Here, the prosecutors struck 9 of 13 otherwise qualified African-Americans, nearly 73 percent as the state trial court and state appellate court found. *Wiggins*, 159 N.C. App. at 265, 584 S.E.2d at 313. Yet the state appellate court all but ignored this statistical disparity in its *Batson* analysis, saying that it alone would not suffice to overturn a trial court's determination that a prima facie case of discrimination had not been shown. *Id*.

The trial court required the prosecutors to proffer reasons for excusing various African-American prospective jurors. When the state proffers reasons for its challenges, the reviewing court proceeds as if a prima facie case of discrimination has been shown.[3] *See, e.g.,*

---

[3]       One of the problems with this procedure as applied in North Carolina is it results
(continued...)

6

*Hernandez v. New York,* 500 U.S. 352 (1991); *State v. Wiggins,* 334 N.C. 18,431 S.E.2d 755 (1993). The burden then shifts to the state to advance race-neutral reasons for exercising the challenged strike. *Hernandez,* 500 U.S. at 359. In this case, the trial court accepted the prosecutors' reasons as race-neutral and non-pretextual.

Respondent again urges this Court to defer to the state court's analysis and disposition on this claim. [Respondent's Supplemental Brief at 22] But it relies on a 1998 decision of the Supreme Court of North Carolina, which reflects a *Batson* protocol developed long before the decisions in *Miller-El I*, *Miller-El II*, and *Snyder*, each of which call into question North Carolina's long-standing reluctance to enforce the principles articulated in *Batson*. The North Carolina courts have a poor history with respect to *Batson. See* Amanda S. Hitchcock, "'Deference Does Not By Definition Preclude Relief': The Impact of *Miller-El v. Dretke* on *Batson* Review in North Carolina Capital Appeals," 84 N.C.L. Rev. 1328 (May 2006). In light of this history, the deference respondent seeks would be seriously misplaced.

**C.  The North Carolina Court of Appeals Unreasonably Failed to Consider the Disparate Treatment of Similarly Situated Prospective Jurors of Different Races.**

On appeal, Carruth identified several African-American members of the venire whom he alleged had been improperly excused by the state based on race. The prosecutors used two

---

[3](...continued)
in the trial court failing to weigh the strength of defendant's prima facie case of discrimination in evaluating whether the prosecutor's reasons are race-neutral. *See Miller-El I*, 522 U.S. at 344. This error by the trial court, tacitly sanctioned by the North Carolina Court of Appeals, is another reason the rejection of the claim by the state courts was an unreasonable application of clearly established federal law.

7

early challenges to remove two of three otherwise qualified African-Americans. (11/25/00 Tp. 500; 11/26/00 Tpp. 627, 683) Carruth objected to this practice. (11/26/00 Tpp. 682-83) The two African-Americans removed could both apply the death penalty and had no hardships that would prevent them from serving, while the lone African-American the prosecutor accepted was a woman who attended the same church as the victim. (11/26/00 Tp. 682) The trial court simply overruled the objection and said Carruth had not established a prima facie case of discrimination. (11/26/00 Tp. 683) Only after the prosecutors struck their eighth African-American did the trial court find a prima facie case and require the prosecutors to state reasons for their challenges.

The reasons articulated by the prosecutors included having children in ages close to the defendant, being a team leader, having equivocal views about capital punishment, and knowing some of the potential witnesses. Many of these reasons applied equally to prospective white jurors whom the prosecutors accepted. For example, the state challenged juror Ardurell Nimitz early in the jury selection process. When the trial court finally required an explanation from the prosecutors, they indicated she had a son close in age to the defendant and was a self-described team leader who might not respect the opinions of others and would have difficulty genuinely participating in jury deliberations. (11/07/00 Tpp. 156-57) A reason as highly subjective as being a leader and thus not one who would listen to other people is rife for being pretextual. *See State v. Giles*, 639 So.2d 323 (La. App. 4 Cir. 1994) (that jurors would be partial to defendant because of shared racial identity, not race-neutral reason);

8

*Richmond v. State*, 590 So.2d 384 (Ala. Cr. App. 1991) (striking African-American juror due to her status as wife of African-American police officer and alleged conflicts between African-American and white officers who might testify in case not race-neutral). Moreover, the prosecutors accepted numerous white prospective jurors who had strong opinions and showed leadership abilities, including Clark Pennell, Samuel Stewart, and Michael Hayes.[4] (11/07/00 Tp. 158) In addition, the prosecutors accepted a number of white prospective jurors who had children close in age to the defendant. But the Court of Appeals did not discuss any of these reasons or the glaringly disparate treatment of similarly situated prospective jurors. *Wiggins,* 159 N.C. App. at 266, 584 S.E.2d at 314.

The prosecutors also claimed they removed Andrea McNeal, Steven Bethune, and Felicia Maxwell due to their equivocal views about capital punishment. However, the prosecutors did not challenge any of these individuals for cause based on their views about the death penalty. Each of them said they could follow the law and impose a death sentence. Aside from the facially questionable nature of these explanations, the prosecutors accepted several white prospective jurors who had equivocal views about capital punishment. These explanations were hardly race-neutral under the circumstances. Again, the Court of Appeals did not discuss any of these reasons or the glaringly disparate treatment of similarly situated prospective jurors. *Wiggins,* 159 N.C. App. at 266, 584 S.E.2d at 314.

---

[4] Not coincidentally, these three men were white, and the prosecutors removed every qualified African-American man called into the jury box with a peremptory challenge.

9

These reasons do not pass constitutional muster. The state appellate court wrote, "that where the only factor supporting an inference of discrimination is the State's heightened use of peremptory challenges against prospective black jurors, and other elements relevant to finding an inference of discrimination are not present, the trial court's determination . . . is not clearly erroneous." *Wiggins,* 159 N.C. App. at 266, 584 S.E.2d at 314. But *Miller-El I* and *Miller-El II* explained that factors ignored by the state court are part and parcel of a proper *Batson* analysis.[5] The Court of Appeals continued the long-standing, misguided approach by the North Carolina courts in resolving *Batson* issues, an approach that caused the Supreme Court of the United States to vacate and remand a North Carolina case containing a *Batson* claim for reconsideration in light of *Miller-El II*. *See Kandies v. Polk*, 545 U.S. 1137 (2005) (vacating and remanding in light of *Miller-El II*).[6] This Court should

---

[5]    The North Carolina courts have a pathetic record in assessing *Batson* claims. One reviewer recently noted that since 1986, "the Supreme Court of North Carolina has reviewed sixty-one *Batson* claims on direct appeal from capital convictions, yet not once has it found a *Batson* violation." Hitchcock, "'Deference Does Not By Definition Preclude Relief,'" at 1308. It appears the Supreme Court of North Carolina may be recognizing the error of its ways. *See State v. Barden*, No. 96A01-2 (11 April 2008) (remanding for second *Batson* hearing and directing trial court to compare and consider voir dire responses of excused African-American and accepted white jurors pursuant to *Snyder* and *Miller-El II*). If North Carolina is re-assessing its approach to *Batson* claims, as *Barden* suggests, this development signals the need for careful review by this Court.

[6]    The state courts had rejected a *Batson* claim in *Kandies*. *See State v. Kandies*, 342 N.C. 419, 435-437, 467 S.E.2d 67, 75-76, *cert. denied*, 519 U.S. 894 (1996). In *Kandies*, the prosecutor challenged nine out of twelve eligible jurors, or seventy-five percent. *Id*. at 435, 367 S.E.2d at 75, identical to the numerical disparity in this case. The remand by the Supreme Court indicates the *Batson* analysis by the state court did not comport with the teachings in *Miller-El*, especially with regard to the importance of the statistical disparity.

10

remain cognizant of this remand.[7]

**D.    The North Carolina Court of Appeals Unreasonably Gave Undue Deference to the Findings by the Trial Court.**

The Court of Appeals also gave undue deference to the trial court. "Our review accords deference to the trial court's ultimate determination because the findings largely 'turn on [an] evaluation of credibility[.]'" *Wiggins,* 159 N.C. App. at 263, 584 S.E.2d at 312 (citations omitted). *Miller-El I* explained the appropriate analysis of the three-step *Batson* inquiry in the context of post-conviction review. While acknowledging a decision on the ultimate question of a prosecutor's discriminatory intent represents a finding accorded great deference, this "deference does not imply abandonment or abdication of judicial review." 537 U.S. at 340.

In post-conviction, a defendant may succeed in his claim if he produces evidence demonstrating that, despite the neutral explanation of the prosecutor, the peremptory strikes in the final analysis were race based. Only one African-American juror ultimately served on Miller-El's jury. The court described the statistical evidence as "remarkable:"

> Out of 20 black members of the 108-person venire panel for Miller-El's trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution. 'The prosecutors used their peremptory strikes to exclude 91% of the eligible Black members. . . . Happenstance is unlikely to produce this disparity.'

-----

[7]    In another case remanded at the same time as *Kandies*, the Louisiana Supreme Court essentially reinstated its earlier analysis and rejected again the *Batson* challenge. *See State v. Snyder*, 942 So.2d 484 (La. 2006). The Supreme Court granted certiorari to review this analysis and has again reversed. *Snyder v. Louisiana*, 128 S.Ct. 1203 (2008).

11

*Miller-El II*, 545 U.S. at 240-41(citations omitted). These statistics played a dominant role in the ultimate determination that the prosecution used racial considerations to strike at least two of the prospective jurors: "It blinks reality to deny that the State struck [these African-Americans], included in that 91%, because they were black." *Id*. at 266.

A reviewing court must also give full consideration to the substantial evidence the defendant puts forth in support of the prima facie case and cannot accept, without question, the lower court's evaluation of the demeanor of the prosecutor and jurors in a trial. *Miller-El I*, 537 U.S. at 341. It must consider the statistical evidence emanating from the prosecutor's use of peremptory challenges to both African-Americans and white prospective jurors. For example, the very large percentage of peremptory challenges used against eligible African-American venire members in *Miller-El I* "alone raise[d] some debate as to whether the prosecution acted with a race-based reason when striking prospective jurors." *Id*. at 342. The strikingly large percentage of African-Americans removed in this case, compared to the much smaller number of whites excused raises the same debate as in *Miller-El I* and further demonstrates the unreasonable application of federal law by the state courts in this case.

Finally, a reviewing court must evaluate evidence of disparate treatment. When a prosecutor proffers purportedly race-neutral reasons for striking prospective African-American jurors that pertain just as well to some white jurors who were not challenged and who served on the jury, this dichotomy provides some evidence of racial motivation. When this disparate treatment is shown on the record, "the application of these rationales to the

12

venire might have been selective and based on racial considerations." *Id.* at 343. It is "some evidence of purposeful discrimination." *Id.* at 344.

Yet the North Carolina Court of Appeals specifically refused to consider that a juror or jurors of a different race from those venire members who were peremptorily excused were asked similar questions by the prosecutor, gave answers similar to those of the prospective jurors peremptorily excused, and later sat on the jury that decided the case. *Wiggins,* 159 N.C. App. at 263, 584 S.E.2d at 312. In doing so, the state court ignored compelling evidence of discrimination. The prosecutor struck Nimitz because she had a son close in age to the defendant. Yet they accepted many white people with children of a similar age. That Nimitz was a self-described team leader must be considered against the acceptance of Pennell, Stewart, and Hayes who had strong opinions and showed leadership abilities. Likewise, the removal of McNeal, Bethune, and Maxwell due to their equivocal views about capital punishment cannot be squared with the acceptance of several white prospective jurors who had equivocal views about capital punishment. These explanations were hardly race-neutral under the circumstances. "[T]his record cannot be called 'evenhanded.'" *Wilson*, 426 F.3d at 670. Thus, the rejection of this claim on direct appeal was contrary to or an unreasonable application of clearly established federal law.

E.     **This Court Must Not Unduly Defer to the State Courts in Light of *Miller-El I* and *Miller-El II* in Light of the Unreasonable Application of Established Federal Law.**

Respondent argues deference is due the state appellate court. [Respondent's Supplemental Brief at 22] However, the unreasonableness of the state court's analysis is

13

revealed by its own methodology. *Wiggins,* 159 N.C. App. at 265, 584 S.E.2d at 313. It purported to examine the race of the key actors. But the race of the key actors cut in favor of the defendant, who was African-American, as were many of his key witnesses. It also found instructive in the state's favor that the prosecutors did not use all of their peremptory challenges. But this finding is immaterial as only one discriminatory strike violates *Batson*. Moreover, the prosecutors did not need to use all of their challenges in order to remove every qualified African-American male. Finally, the ultimate make-up of the jury was of little consequence in light of the large percentage of African-Americans stricken by the prosecutors.

A primary aspect of the *Batson* showing arises from the successful use of peremptory challenges to remove every African-American male, not coincidentally the same race and gender as Carruth himself. The prosecutor used four of his peremptory challenges to remove every African-American man who was properly qualified to serve as a juror. *Wiggins,* 159 N.C. App. at 267, 584 S.E.2d at 314. An African-American man cannot properly be removed from a jury because he might be more sympathetic toward and receptive to another African-American man. *See J.E.B. v. Alabama,* 511 U.S. 127, 143 (1994). Carruth specifically objected to the removal of these four prospective jurors based upon their race and gender. A prima facie case was established, but not considered by the trial court in its evaluations of these challenges, contrary to *Miller-El I. Guzman v. State,* 85 S.W.2d 242, 254-55 (Tex. Cr. App. 2002) (*en banc*); *State v. Lucas,* 18 P.3d 160, 164-65 (Ariz. 2001).

14

The state court wholly missed the mark in its analysis. It merely noted the prosecutors' use of "only four of the State's fourteen peremptory challenges . . . makes it more difficult for a defendant to establish a pattern of strikes indicating that purposeful discrimination is the motivating factor." *Wiggins,* 159 N.C. App. at 267, 584 S.E.2d at 315. To the contrary, where a prosecutor removes every member of a cognizable group, the inference of purposeful discrimination is readily apparent. Indeed, the suggestion by the state court that the prosecutors used "only four" of their peremptory challenges to African-American men begs the question, as four was all they needed to strip the jury of every African-American man.

Males are a constitutionally cognizable group. *Craig v. Boren*, 429 U.S. 190, 197-99 (1976). When a party engages in a pattern of excluding members of a discreet group, it is likely these people are being excluded solely on the basis of membership within this group. *Commonwealth v. Rodrigeuz*, 431 Mass. 804, 807, 731 N.E.2d 71, 75 (2000). Here, there was a clear pattern of race and gender discrimination when the prosecutor used peremptory challenges to remove all four of the qualified African American men from the jury. The removal of every African-American man from the jury with peremptory challenges not only established a prima facie case under *J.E.B.*, but also showed purposeful discrimination that rebutted any explanation for the removal. *State v. Donaghy*, 769 A.2d 10, 15 (Vt. 2000). The Court of Appeals analysis was also woefully inadequate, as "[h]appenstance is unlikely to produce this disparity." *Miller-El*, 123 S.Ct. at 1042.

15

Merely because the prosecutor stated reasons other than race does not save the strike from constitutional infirmity. *See United States v. Chinchilla,* 874 F.2d 695, 698-699 (9th Cir.1989); *see also Moore,* 811 S.W.2d at 200 ("even though the prosecution may have given one racially neutral explanation, the racially motivated explanation vitiates the legitimacy of the entire jury selection process").[8] Striking even one African-American on the basis of race impugns the fairness of the jury and entitles Carruth to a new trial. *State* v. *Robbins,* 319 N.C. 465,491,356 S.E.2d 279, 295, *cert. denied,* 484 U.S. 918 (1987).

The state court erroneously rejected this claim. It did so both by applying clearly established federal law in an unreasonable manner and by making an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) & (2). Accordingly, a writ of habeas corpus must be issued.

**CLAIM TWO: RESPONDENT CANNOT CARRY ITS BURDEN OF PROVING THAT THE IMPROPER UNCONSTITUTIONAL ADMISSION OF THREE INCRIMINATING HEARSAY STATEMENTS MADE BY THE VICTIM BEFORE SHE DIED HAD NO SUBSTANTIAL INFLUENCE ON THE VERDICT**

Two separate state courts have now found Rae Carruth's constitutional right to confrontation was violated by the admission of three statements by Cherica Adams: the first made at the scene of the shooting, the second made in the emergency room before her surgery, and the third made in the recovery room after her surgery. All three statements directly and

---

[8]    *Batson* is violated where race neutral reasons are so intertwined with race-based reasons so as to demonstrate a racially motivated basis for the challenge. *See, e.g., Rector v. State*, 444 S.E.2d 862 (Ga. App. 1994).

16

prejudicially implicated Carruth in the shooting. The only question for this Court is whether the admission of all three of these prejudicial and uncross-examined statements, taken and considered together as a whole, was harmless error. As no state court has yet addressed this issue, this Court must do so, applying the test in *Brecht v. Adamson*, 507 U.S. 619 (1993).[9] A proper analysis under *Brecht* compels the conclusion that the admission of this testimony substantially influenced the jury's verdict, and Carruth's convictions must therefore be vacated by issuing a writ of habeas corpus.

**A.      The Statements of Cherica Adams Were the Centerpiece of the State's Case.**

**1.      Cherica Adams' Statements Were the Only Uncontradicted Evidence About Rae Carruth's Alleged Role in the Shooting**.

At Carruth's trial, several facts were undisputed. First, Adams was shot to death by Watkins. Second, Watkins was riding in Kennedy's car when he fired the fatal shots. Third, Kennedy had just bought the gun Watkins used while Carruth and Adams were watching a movie at a local theater. Fourth, Kennedy pulled up next to Adam's car on a dark, winding, and hilly road to give Watkins a clear shot.

_____

[9]      Although Carruth's memorandum in support of the habeas petition, and respondent's answer and motion for summary judgment, both written in 2005, discuss the applicability of *Chapman v. California*, 386 U.S. 18 (1967), in light of the state courts' failure to consider the effect of all the inadmissible statements taken as a whole, and whether the state courts' piecemeal *Chapman* analysis was reasonable, the decision in *Fry v. Pliler*, ___ U.S. ___, 127 S.Ct. 2321 (2007) makes clear that regardless of the answers to those questions, this Court must apply the *Brecht* test in determining whether the admission of all three of the Adams' statements (those made at the scene, those made at the hospital before surgery, and those made shortly after surgery), while denying Carruth his Sixth Amendment right of confrontation, were nevertheless harmless when taken and considered together.

17

What was very much in dispute was whether Carruth had planned the shooting because of a financial motive, to avoid paying child support, and whether he had played an active role by stopping his car on a back road and blocking Adams so Watkins and Kennedy could pull up and shoot her. To say the state's evidence on these issues was hotly contested would be a gross understatement. In all, the defense called forty-seven (47) witnesses to testify on the disputed issues. Their testimony took twelve (12) days to present and consumed about two thousand (2000) pages in the trial transcript.

For example, with regard to the alleged financial motive, the defense presented evidence from the Carolina Panthers, Carruth's banker, and a forensic accountant that Carruth had ample funds to pay any child support that might be owed, that his professional career was on track, and that his financial future was bright.[10] The defense also presented evidence Carruth was excited in November 1999 about the upcoming birth of his baby and had purchased furniture for the baby.[11] For virtually every witness called by the state on relevant issues of fact, the defense presented conflicting or impeaching evidence (and sometimes both).

_____

[10]    *See, e.g.*, testimony of William Floyd, (12/12/00 Tp. 302); Mushin Muhammed, (12/13/00 Tpp. 340-343, 353-354); Hannibal Navies, (12/14/00 Tpp. 383-384); Marty Hurney, (12/14/00 Tpp. 500-517); Erika Worthy, (12/18/00 Tpp. 14-35); and Adrian Barnett; (12/18/00 Tpp. 36-80)

[11]    *See, e.g.*, testimony of Mushin Muhammed, (12/13/00 Tpp. 345-346); Hannibal Navies, (12/14/00 Tpp. 402-403); Dawnyk Willard, (1/8/01 Tp. 60); Ron Guerette, (1/2/01 Tpp. 231-236) and Defendant's Exhibits 174-182.

18

There was one glaring exception to this contradiction. These were the statements made by Adams in response to various questions, sometimes very leading questions, while she was in shock right after the shooting, and under the effects of sedation after her surgery, which came into evidence uncross-examined and, therefore, uncontradicted. The effect was exactly what the prosecution intended – devastating evidence that could not be rebutted. Respondent concedes this evidence was "important." [Respondent's Supporting Brief at 47] In reality, it was the centerpiece of the state's case.[12]

## 2.      The State's Case Hinged on What it Characterized as Adams' "Eyewitness Testimony."

The state began its focus on the uncross-examined statements made by Adams in the hours after she was shot by Watkins in its opening statement. At the very beginning of his opening, the prosecutor noted that "Cherica Adams wasn't supposed to be an eyewitness to what the defendant had done to her and to her son. She wasn't supposed to, but she did." (11/20-21/00 Tpp. 11-12) He went on to say that she was "a voice" and "her message, Rae Carruth did this." He noted that when the police arrived at the scene, and asked "who shot you," she was a "voice" who said "my baby's daddy, Rae Carruth." Then, for over three pages, the prosecutor focused on her statements at the hospital:

_____

[12]      Although respondent attempts to distance itself from the importance of this evidence by claiming to avoid it in the statement of facts [Respondent's Supporting Brief at 48], its statement of facts quotes at length from the answers Adams gave after her surgery. [Respondent's Supporting Brief at 4-6] This evidence was ruled inadmissible by the North Carolina Court of Appeals.

At Carolinas Medical Center she was being wheeled from the emergency room, to the operating room, down the hall to the elevator.

Officer [Peter] Grant with the Charlotte-Mecklenburg Police Department walked along beside her, beside the gurney and talked to her - - to the elevator, waiting on the elevator up, down the hall to the operating room, was talking.

Said, did your boyfriend shoot you. She shook her head, yes. Nodded yes.

And then Cherica Adams told Officer Grant that she and Rae Carruth had been to the movies. After the movies they went to his house. And then they were going from his house to her apartment. They were going down Rea Road, she was following him, he started slowing down in front of her.

And then she said, I couldn't figure out why he stopped in the middle of the road, and then another car, she said, pulled beside her and started shooting.

* * * * * *

Later that morning after the surgery, about 7:30 in the morning, trauma intensive care nurse Traci Willard was with Cherica. By then she couldn't talk, because a breathing tube had been put into her throat. A tube that ran from the ventilator down her throat to her lungs to breathe for her. She couldn't talk, but she could communicate. And she pointed to her own stomach.

Nurse Willard asked, Cherica said, do you remember what happened to you. She nodded her head, yes. And then she signaled with her hand. She wanted to write.

A voice say to everything listening.

As Nurse Willard held the clipboard for Cherica, she wrote. And you will see in the evidence in this courtroom her handwritten notes.

20

She wrote that she and Rae had been to a movie. And then back
to his house. He then insisted - - he

* * * * * *

insisted that they go to her place. She said, before she wrote - -
before they left he made a call in the kitchen. She overheard him
say, we're leaving now.

She was driving. He was driving. He was in front of her, she
wrote. And he stopped in the road and a car pulled up beside her.
She wrote that Rae blocked the front and he never came back.

As she was writing, some of her family, her father, her brother,
her cousin came in, and Nurse Willard showed them what
Cherica had written, and they started asking her questions.

Then a police officer came in and he started asking her questions
about what happened. And then Doctor Thomason, the head of
trauma intensive care came in and said its time for Cherica to
rest. And she went to sleep, a sleep from which she would never
again awaken, not in this life.

(11/20-21/00 Tpp. 14-16)

The next portion of the opening dealt mostly with uncontested facts, including various

phone calls. Not once did the prosecutor say that anyone other than Adams would directly

implicate Carruth in the shooting. Not once did he talk about the expected testimony of

Michael Kennedy or Candace Smith. (11/20-21/00 Tpp. 17-22) Finally, in winding up his

opening statement, the prosecutor came back to his theme: Cherica Adams as the key

eyewitness.

She told the 911 operator what Rae Carruth had done to her and
her baby. She told medic. She told Officer Grant. She told
Nurse Willard. Through the evidence, *she's gonna tell you*, Rae

21

Carruth did this."

(11/20-21/00 Tp. 22) (emphasis added).

The first two witnesses called by the state were the 911 operators who spoke to Cherica. (11/20-21/00 Tpp. 89-115) Through them, the state introduced its first two exhibits: the 911 call and a transcript of that call, which were State's Exhibits 1 and 2. Although the admission of parts of that call is also challenged in this proceeding,[13] it was far less damaging substantively than the evidence about what she said at the scene, at the emergency room, and after her surgery. The 911 call mainly evoked enormous sympathy from everyone in the courtroom for Adams and her baby, as the fear and pain in her voice after being shot five times echoed in the jury's ears. Anyone who has heard a murder victim on a 911 call just before she dies knows the powerful emotional reaction it creates in the courtroom and the jury box.[14]

---

[13]      *See* Claim III, *infra.*

[14]      During this call, after some leading questions by the 911 operator suggesting that Carruth was involved in the shooting, Adams said that she was following Carruth when "*he slowed down. And a car pulled up beside me*" and shot at her. (11/20-21/00 Tpp. 107-108) She did not say *why* he had slowed down, and there was evidence that Rea Road was dark and hilly in the vicinity where the shooting took place. (11/29/00 Tp.193) So this statement was ambiguous at best. In addition, even if the 911 call is held to be admissible, there were a number of key assertions in the other statements that went far beyond what she said during the 911 call. For example, in the statements to Officer Grant, she said that Carruth had *stopped and blocked her in.* She also said Carruth had shot her. In the statements to the nurse she repeated again that he had stopped his car and blocked her in, said he had "insisted" on coming to her house after the movies, that he made a phone call to someone before leaving the house and told that person "we're leaving now," that the call was made from the kitchen, and that he had called his teammate, Hannibal Navies. (11/20-21/00 Tpp. 196- 229) The prosecutor in his opening statement and closing argument referred to all of these statements, and particularly the statements
(continued...)

The very next witness was the medic at the scene, Nicole Michaels.  In addition to some emotional (but undisputed) testimony about Adams's wounds and the emergency treatment she was given,[15] Michaels was asked about the questions Officer Grant had asked Adams. (11/20-21/00 Tpp. 115-143)  In an attempt to bolster the credibility of Adams' statements at the scene and the emergency room, Michaels was asked whether Adams was mentally alert at the time she spoke to the officer.  She replied that Adams was "very alert." (11/20-21/00 Tpp. 123-124)  She also testified that when Adams was asked by Officer Grant who shot her, she told him it was Carruth. (11/20-21/00 Tp. 123)

Continuing with the focus on Adams' uncross-examined statements, the next witness called by the state was a nurse at the hospital, Traci Willard.[16]  Willard first met Adams when she was coming out of emergency surgery, while still recovering from the anesthesia she had been given. After getting the preliminary questions out of the way, the prosecutor immediately turned to the notes Adams had written after her surgery.  Each page of Adams' notes was marked and introduced before the jury as a separate exhibit.  Then a blowup of each page was marked and introduced separately.  And then a color coded blowup of each page was marked and introduced separately.  See State's Exhibits 9, 9A, 9B, 10, 10A, 10B, 11, 11A and 11B.

---

[14](...continued)
about Carruth allegedly stopping his car and blocking Adams in, to argue he was part of the conspiracy, which is the crime for which he ultimately was convicted.

[15]     Michaels was also used to introduce various photos of Adams, her car, Rea Road and a church, as well as a diagram map of the area.  None of this evidence was in dispute.

[16]     (11/20-21/00 Tpp. 186-267)

23

The prosecutor first directed Willard's attention to the written statement on a corner of the first page of the notes, which was State's Exhibit 9. It said "He was driving in front of me and stopped in the road and a car pulled up beside me and he blocked the front and he never came back." He had Willard read this statement to the jury from the notes, and then he read the same words back to Willard, to confirm this was what Willard had done with Cherica at the time. (11/20-21/00 Tpp. 196-197) Then he asked Willard if she had asked Adams who had blocked her in, and Willard told the jury that Adams had written the word "Rae" in response. Again the prosecutor repeated the answer, this time twice. (11/20-21/00 Tp. 198) Then he asked what else Adams had written on the first page, and Willard replied that she had written, "He insisted on coming to my house." Once again, the prosecutor repeated the statement. (11/20-21/00 Tp. 200) He then marked and introduced, over objection, the first blowup of that page as Exhibit 9A, and the second blowup of that page as Exhibit 9B. (11/20-21/00 Tpp. 200-201) He then had the witness come down from the witness box and stand next to the blowups in front of the jury. He pointed to the area of the first statement and asked her to "please read to the jurors slowly, word for word, what Cherica wrote in this area of that first piece of paper." (11/20-21/00 Tp. 202) The trial court overruled defendant's objection that the question had been "asked and answered now several times," and Willard read, yet again, "he was driving in front of me and just stopped in the road and a car pulled up beside me and he blocked the front and never came back." (11/20-21/00 Tpp. 202-203) Then the prosecutor himself repeated the same phrase again. (11/20-21/00 Tp. 203) He did the same

24

thing with the other two statements Adams had written on the first page of notes - the answer "Rae" to the question who blocked the front, and the statement "he insisted on coming to my house." (11/20-21/00 Tpp. 204-205) Then he went back to the original notes, Exhibit 9, and repeated each statement yet again, asking if what was on the blowup was what was written on the original notes. (11/20-21/00 Tp. 206) After all this, he published the original notes, Exhibit 9, to the jury, and tried to publish one of the blow-ups, Exhibit 9B, as well.

He followed this precise procedure for each separate statement written on the other two pages of Adams' notes. (11/20-21/00 Tpp. 218-229) For example, Willard testified that Adams had written "before we left his house he called someone and said we were leaving now." The prosecutor repeated these words, then had Willard come down and read them from the blowup, and he then repeated them again. Then he published the original notes to the jury. (11/20-21/00 Tpp. 220-222) He also asked Willard again if Adams appeared to be mentally alert when she was writing the notes, and Willard replied that she did.

Following Willard, the next four witnesses[17] testified to facts that for the most part were not in dispute. But two of them, Modrey Floyd, her cousin, and Jeffery Moodie, her father, were asked about the circumstances surrounding the making of the notes in the hospital, thereby drawing the jury's attention back to this evidence. (11/20-21/00 Tpp. 321, 344) By obvious design, the focus for the first two days of the prosecution's case was

---

[17]     Farrell Blalock, the man into whose yard Adams drove;  Modrey Floyd, the cousin who lived with her;  Jeffrey Moonie, her father;  and Melvin Billingslea, an acquaintance of Carruth.  (Tr. 267-410).  None of these witnesses knew anything about what had actually happened to Adams on Rea Road.

squarely on Adams' uncross-examined statements.

Michael Kennedy was then called in an attempt to corroborate Adams' statements. But he was subjected to a lengthy cross on numerous issues, including his desire to avoid prosecution entirely, a letter he had written to the DA requesting leniency, many of the "facts" he testified to had never been mentioned by him in his lengthy interviews with the police, the fact that he was a drug dealer, the inconsistencies in his various statements, and the many implausibilities in the story he told the jury, not the least of which was that he claimed (for the first time at trial) he participated in the crimes only because Carruth had allegedly threatened his life that night, although Carruth had never been in trouble for anything, even a fight.[18] Then, according to Kennedy, while Carruth was at the movies with Adams, he was forced to go looking for a gun with Watkins, calling a friend who had one for sale fourteen (14) times between 9:00 p.m. and 11:00 p.m. before finally reaching him. Then Kennedy drove around the neighborhood, waiting for Carruth and Adams to leave the movies. In short, he claimed (1) Carruth had engaged in a careful plan to have him and Watkins shoot Adams, but the plan was not put into place until a few hours before the shooting, (2) he had to be threatened to participate, (3) neither he nor Watkins nor Carruth had a gun, and (4) he and Watkins had to go looking for a gun while Carruth was in the movies, not knowing if they had

---

[18]     The many inconsistencies and implausibilities in Kennedy's testimony, and the rest of the state's evidence, are fully set forth in the defendant's closing argument.  (1/15/01 Tpp. 363-471)  Rather than merely repeating them in this pleading, Carruth respectfully asks the Court to consider all of these inconsistencies and implausibilities, which are incorporated by reference, in considering the impact that Adams' statements, which could not be contradicted, had on the jury.

Case 3:05-cv-00346-GCM   Document 26   Filed 05/06/08   Page 26 of 63

even succeeded in finding one.  (11/27/00 Tpp. 127-150; 1/28/00 Tpp. 178-182)

Following Kennedy's cross-examination, the state returned to Adams' uncross-examined and unrebuttable statements.  Now the prosecution called Officer Grant, who responded to the scene, and then followed Adams to the hospital.  First, Grant was asked if Adams said anything at the scene.  Officer Grant replied:

> "I asked the victim, at that point in time, I said, *'Do you know who shot you?'  At that point in time she told me 'Rae Carruth.'* I then asked her, I said, 'Who is Rae Carruth?' . . . .  And she said . . . That's my baby's daddy."

(11/29/00 Tp. 196)  The prosecutor then turned to the questioning conducted by Officer Grant at the emergency room:

> "At that point in time, I basically asked her, point blank, I said, 'did your boyfriend do this to you?' And she nodded her head 'Yes.'
>
> Once I got that response from her, I then asked her, I said 'What happened? Did you have a fight prior to this?  What led up to this?  And she told me, at that point in time that her boyfriend, Rae Carruth, had gone to the movies that night.  After they had gone to the movies, they had gone back to Rae's house to get her car.
>
> Then – she said then that they went back to her house or her apartment and she got her car.  And she was following Rae Carruth down Rea Road.  *She said that along Rea Road, Rae Carruth came to a stop.  She had to stop, because at the point in time where they stopped, it was only a 2-lane road, and she couldn't go around, either way.*
>
> *And, she said, when they stopped the car, a car pulled up next to her, and shots began firing.*  And then, that's when she made the call to 911.

(11/29/00 Tpp. 200-201) (emphasis added).  Grant was then asked why he asked Adams at the emergency room who had shot her if he already had that information at the scene, and Grant replied "Confirmation; make sure that the answers that she was going to give me were going to be the same.  In both cases, they were."  (11/29/00 Tpp. 201-202)

On redirect, yet another portion of Adams' statement was elicited.  The prosecutor asked if Adams had told him anything about any calls she had made.  Officer Grant replied:

> She said she called to her apartment. . . . She said when she called her apartment she spoke to her roommate and had advised them that she would like them to straighten up because her and Rae were on the way over.

(11/29/00 Tpp. 240-241)

Taking the statements that Adams made at the scene, at the emergency room, and after her surgery together, the state was able to present to the jury, uncross-examined, unrebutted, and uncontradicted, what it characterized as "eyewitness testimony" that Carruth had insisted on going to her apartment after the movies, that he made a call to Hannibal Navies before leaving his house, that Adams was following immediately behind him, that he stopped his car on Rea Road and blocked her in, that she could not get around him, that while she was stopped and blocked there on Rae Road, another car (driven by Kennedy) had pulled next to her and she was shot, and that Carruth had then just driven away.  The prosecutor used all of this evidence in his closing to argue Carruth was a "coward" who planned the shooting of Adams.  (1/15/01 Tpp. 317-327)

Case 3:05-cv-00346-GCM   Document 26   Filed 05/06/08   Page 28 of 63

### 3. The Remaining Evidence did not Address Carruth's Alleged Role in the Shooting of Cherica Adams.

Most of the rest of the state's case against Carruth related to facts that were not in dispute and were completely consistent with the defense. The state called at least five different witnesses to testify about phone calls between Carruth, Watkins, and Kennedy;[19] the defense presented evidence that the calls were consistent with a drug deal, which was also consistent with what Watkins told a deputy sheriff after his arrest.[20] The state called at least five witnesses to testify about the evidence collected at the scene and a gun recovered later;[21] none of this evidence was physically tied to Carruth, and most of these witnesses were not even cross-examined. The state called at least two witnesses to establish another undisputed fact, that Carruth was with Adams on the night she was shot;[22] the defense established through these same witnesses that the two of them were happy and joking. Dr. Michael Thomasen,

---

[19] Testimony of Shaleish Patel, Lynn Skiner, Miles Biggerstaff, Susan Artieri, and Dwight Perry. (12/04/00 Tpp. 251-395) Two other witnesses were also called primarily to testify about phone calls. Modrey Floyd testified about a call that Cherica Adams made to him shortly before she was shot. (11/20-21/00 Tpp. 328-373) Tonya Ferguson testified about a phone call that Mr. Carruth made to Hannibal Navies, his teammate, shortly after midnight that same night. (12/04/00 Tpp. 395-469)

[20] Testimony of Ron Guerette (12/14/00 Tpp. 551-694); Testimony of Sgt. Shirley Riddle and Sgt. Tommy Stamps of the Mecklenburg County Sheriff's Department. (12/20/00 Tpp. 324-371; 394-415)

[21] Testimony of Officer Melissa Warren, Christine Tichner, Brian Nearpass, Officer James Wright, and Crime Lab technician Bill McBrayer. (12/04/00 Tpp. 146-154, 469-497, 503-605)

[22] Testimony of Melvin Billingslea, (11/20-21/00 Tpp. 373-410) and Tonya Ferguson (12/04/00 Tpp. 395-469)

29

the surgeon who operated on Adams, testified to her wounds and the surgery.[23]  Thomasen

was also asked questions about Adams' condition at the time she wrote the notes testified to

by Willard, thus returning to and emphasizing that subject yet again.  (12/04/00 Tpp. 678-681,

698-707)

### 4. The Evidence Relied Upon by the State in Arguing Harmless Error Pales in Comparison to the Statements of Cherica Adams.

In an attempt to deflect this Court's attention away from the harm caused to Carruth

by the admission of the critical, but uncross-examined, testimony by Adams, respondent

recounts much evidence that was wholly circumstantial, only marginally relevant, and of

doubtful persuasiveness.  This evidence pales in comparison to the words of the victim

–words the state used over and over during the trial.

For example, respondent points to the testimony of two former girlfriends (Michelle

Wright and Amber Turner), who testified on rebuttal (not during the state's case-in-chief)

about their relationships with petitioner, his attitude towards child support, and several alleged

incidents between them and Carruth relating to that issue.  But neither had *any* information

about what had happened on the night Adams was shot, both were contradicted in material

respects by defense witnesses (including Turner's own mother), and both were subject to

substantial impeachment due to bias.[24]  Adams' cousin, Modrey Floyd, testified to a phone

---

[23]     Testimony of Michael Thomasen (12/04/00 Tpp. 656-753)

[24]     Wright testified primarily about child support, and an inappropriate joking remark
Carruth made on one occasion, but admitted that once he turned pro, Carruth made all his

(continued...)

30

conversation he had with her that night, but he knew nothing about what happened to her thereafter. (11/20-21/00 Tpp. 311-328) Melvin Billingslea, while called by the state to establish that Watkins and Kennedy, who both plead guilty to shooting Adams, were at Carruth's house earlier that night (a fact Carruth did not contest), actually helped the defense by establishing that Carruth had told him he had made Watkins and Kennedy leave because he was taking Adams, whom he called his "lady" or his "girl" (and not anything derogatory or demeaning) to the movies. (11/20-21/00 Tpp. 373-410)

In fact, there were only two witnesses called by the state during the trial who claimed to know anything about what had happened to Adams on Rea Road: Michael Kennedy and Candace Smith.[25] Kennedy, who was charged with the murder and ended up pleading guilty

---

[24](...continued)
payments. (1/2/01 Tpp. 510-512) Turner testified primarily about an alleged abortion she claimed Carruth insisted on when she got pregnant (after they had broken up), and a letter Carruth wrote to her. Turner's mother testified to her daughter's bias against Carruth. Testimony of Barbara Turner (1/9/01 Tpp. 93-110) Turner was also impeached by a tape of a phone conversation she had with Petitioner's counsel that was inconsistent with her testimony on direct examination, (1/2/01 Tpp. 437-442) and by an interview she had with a forensic psychologist, Dr. Jonathon Gould. (1/9/01 Tpp. 152-157) Many of defendant's witnesses also directly refuted what Turner and Wright claimed about Carruth's attitude about child support. See footnotes 1 and 2, *supra*.

[25] Kennedy and Watkins were clearly accomplices in the shooting of Adams. There was also evidence that Candace Smith and Watkins knew each other, that they were seen together in strip clubs (she was a stripper and he was a bouncer), and that Watkins, in a call from the Mecklenburg jail in March 2000, around the time the police had started looking for Smith, had told someone "tell Candace if she cares at all about Michael, she should keep her mouth shut" and not talk with the police. *See* (11/29/00 Tpp. 399, 397-406; 12/20/00 Tp. 347; 1/2/01 Tp. 12) Smith also insisted on immunity before talking to the police. (11/29/00 Tpp. 509-510) Thus, Smith herself may have been an accomplice. Indeed, the jury was instructed that because she was testifying under a grant of immunity, they should "examine her testimony with great care and
(continued...)

Case 3:05-cv-00346-GCM    Document 26    Filed 05/06/08    Page 31 of 63

to second degree, testified in an attempt to shift responsibility away from himself and onto

Carruth. Six months before he got on the stand, he wrote to the prosecutors as follows:

> Neither one of my attorneys know that I am writing you. This decision was made by me, *in an attempt to get the charges dropped* from both me and Stanley. I will still cooperate, just as I have been doing all along.

(11/27/00 Tp. 70) He hoped his testimony would secure a favorable plea agreement, which

it eventually did. He was subjected to impeachment on his background as a drug dealer

(11/28/00 Tpp. 134-135, 156-157), the fact that he had studied the statements of other

witnesses before testifying himself (11/28/00 Tpp. 135-136), the numerous inconsistencies

with and omissions from his own prior statements (11/27/00 Tpp. 151-160; 11/28/00 Tpp.

2-15, 19-20, 35-37, 51-122), his motive for testifying (11/28/00 Tpp. 129-133), the

implausibilities of his story (11/27/00 Tpp. 27-150; 11/28/00 Tpp. 178-182), and the fact

police had asked him questions that suggested the answers they wanted from him from the

very beginning of his cooperation, a year before he testified. (11/27/00 Tpp. 110-117) His

---

[25](...continued)
caution in deciding whether to believe her. (11/29/00 Tp. 270) A similar instruction was given before the testimony of Watkins. (12/20/00 Tp. 10; 1/16/01 Tpp. 522-523). The jury was also told that Kennedy, who served primarily to corroborate Adams' previous and well-publicized statements, and Watkins were accomplices, and that their testimony therefore had to be examined "with the greatest care and caution." *Id.* at 523. The other evidence noted by the state in its motion for summary judgment, that Carruth was arrested while hiding in the trunk of a car, and that he had made cell phone calls to Kennedy and Watkins, was not disputed, and was explained through the testimony of other witnesses, such as a former Charlotte narcotics investigator, (12/14/00 Tpp. 551-694); Carruth's first lawyers, (1/2/01 Tpp. 127-132; 164-171), and his bail bondsman. (1/2/01 Tpp. 205-210)

testimony was also contradicted by Sgt. Riddle, who testified Watkins told her at the jail that he

> told Kennedy to pull up beside of Cherica's car; we had lost track of Rae; we wanted to see which way he was headed . . . . And then, she slowed down; I think she may have thought that we wanted to pass her. . . . I was telling her to roll her window down so we could talk to her. . . . She flipped me off. . . . Sgt. Riddle, I just lost it; I lost control. . . . I just started shooting. . . . Sgt. Riddle, it was Rae's fault. If he had just given us the money, none of this would have happened.

(12/20/02 Tp. 338).[26]

Candace Smith was also substantially impeached. She had no first hand knowledge about the shooting, but claimed Carruth made admissions to her that morning, and was also subjected to substantial impeachment. Respondent recounts Smith's testimony that Carruth said, at the hospital, he stopped the car in front of Adams, then drove away, but he would not

---

[26]     The state did not call either of the other two admitted participants, Stanley Abraham (who was with Kennedy all night), or Van Brett Watkins, with whom it had entered into a plea agreement, to corroborate Kennedy's version of the events. The defense called Watkins to establish his violent tendencies and his statements to jail guards that he shot Adams because he had "lost it," and not pursuant to any plan with Carruth. (12/20/00 Tpp. 10- 145, 217-262,280-292) Watkins ability to lose it and shoot somebody was amply demonstrated for the jury. He admitted setting another person on fire, stabbing his own brother to "get even" with him, threatening to kill witnesses against him, taking a meat cleaver to the woman he claimed to love, assaulting two police officers, pistol-whipping someone for stealing from a drug house, beating a woman's head into a car, and various other sociopathic acts. He claimed he "swung in the jungle," admitted trying to manipulate the criminal justice system in the past, and said, shortly after he was arrested, while Adams was still alive, "I hope the bitch dies." At one point he told defense counsel, in front of the jury, " I can kill you with my hands. I don't need a gun,"and "I'm 286 pounds and I could rip you like a rag doll." (12/20/00 Tpp. 289-290)

33

get in trouble because he did not pull the trigger. [Respondent's Supporting Brief at 55][27]

Respondent contends that this testimony "hardly sounds contrived, as it is unlikely that Smith would be able to fabricate a detail such as this." [Respondent's Supporting Brief at 55] Nothing could be further from the truth. In fact, as shown on cross-examination of Smith, she had *not* told the police about these alleged admissions by Carruth when she was interviewed on tape the morning of the shooting, after Carruth had gone to the police department to be questioned. (11/29/00 Tp. 484) On the contrary, she told the police that morning Carruth had said nothing negative about his relationship with Adams, that he was upset and crying at the hospital, that after Adams got out of surgery he said he was hoping everything would be alright, that he was glad his son was okay, and that she (Candace) had not talked to Carruth about what had happened to Adams that night. (11/29/00 Tpp. 385-394, 485)

Smith again did not claim Carruth made these admissions when she was interviewed, on tape, by a defense investigator a few months later. (11/29/00 Tpp. 355-383) Instead, she said again that he was upset at the hospital, that his eyes were "all teared up," and that he had always said he would support the baby. (11/29/00 Tpp. 355-383)

Most importantly, Smith did *not* tell Lyle Yurko, the lawyer she hired to negotiate her immunity, during a *two day* debriefing, that Carruth had made such comments. (11/29/00 Tpp. 520-522, 532-533, 538-539) Indeed, she admitted that she had not initially told Mr.

---

[27] In fact, she testified Carruth told her "he hit his brakes, in his car, to slow her car down." (11/29/00 Tp. 317)

34

Yurko a number of things that she testified to at trial. (11/29/00 Tpp. 530-539)[28] She also

admitted she had threatened to beat Adams up because Carruth had talked to her while on a

date with Smith, *Id*. at 419-428, 431, that she had gotten mad at Carruth on that occasion, *Id*.

at 494, and that on another occasion she had threatened Carruth with a box cutter when she

discovered another woman at his house. (11/29/00 Tpp. 419-28, 431, 494, 530-539, 559-

561)[29] Finally, she did not come forward with her incriminating statements for six months,

until she heard the police were looking for her, and she decided for some reason that she

needed immunity and hired Lyle Yurko. (11/29/00 Tpp. 509-510) Her desire to protect

herself, and her bias against Carruth, were apparent.[30]

5. **The State Itself Stressed the Importance of Cherica Adams' Statements in Closing Argument.**

The state returned to its focus on the uncross-examined statements in the closing

arguments. The prosecutor started his summation by accusing the defense of trying to make

Adams "disappear" by calling numerous defense witnesses, but stressed nevertheless "Cherica

is still here. *She's a voice, saying to you* 'Rae Carruth did this. He did it.'" (1/15/01 Tp. 318)

---

[28]     Much of what she testified to had been extensively reported in the local media. Smith admitted reading the *Charlotte Observer* stories about the case (11/29/00 Tp. 507), although she denied reading the details of what Watkins and Kennedy were claiming, as reported by the *Charlotte Observer* on March 29, 2000. (11/29/00 Tpp. 539, 546)

[29]     Hannibal Navies testified about Candace Smith's jealousy and instability at some length. (12/14/01 Tpp. 376-380)

[30]     Respondent also notes that Smith testified Carruth had told her he believed Adams had been sleeping with a number of men and therefore had doubts the child was actually his. This testimony, however, weighed *against* a motive to kill Adams and the child, since Carruth would not have to pay child support if the child turned out not to be his.

35

(Emphasis added).  He continued:

> Cherica Adams is still here.  *That's the voice talking to you today.  What she went through to be here.  The pain she endured to tell you:*
>
> 'Before we left his house, he called someone and said we're leaving now. . .'  *He blocked the front of my car.  He stopped in the road.  The car pulled up and shot me.'*
>
> *Cherica Adams told us Rae Carruth stopped and blocked*; And she was shot and he left her.

(1/15/01 Tpp. 319-320) (emphasis added).  He then argued that the physical facts "confirmed" what Adams had said:  "*Cherica Adams was stopped*."  "She was stopped.  The physical facts tell you that.  *Cherica Adams tells you that*."  (1/15/01 Tpp. 320 -321)  He said,  yet again,

> "Why would a young, expectant mother, driving in a car, alone, *stop on this dark road*.  Because of some strange car, with Van Watkins?  Obviously not.  Commonsense and *Cherica Adam's words tell you why*.  Because he led her right into that trap.  *Rae Carruth stopped; and, he stopped, she stopped.*"

(1/15/01 Tp. 321) (emphasis added).  He argued that Adams had resolve "to hold on for you, I contend, *to tell you* what happened."  (1/15/01 Tp. 322)  He played the 911 tape again, and said that "Rae Carruth didn't count on Cherica surviving to tell Ferrell Blalock, Officer Grant and Nicole Michaels, what he had done to her.  You heard all three of those folks tell you they heard Cherica say the defendant, the baby's daddy, boyfriend, shot her."  (1/15/01 Tp. 323)  The prosecutor pointed out the medic said they gave Adams no medications before arriving at the hospital, the surgeon testified she was awake and talking, and Grant testified that she was alert.  And then he argued what Adams told Grant:

36

> "He confirmed what she told him at the scene. That is, he asked her, to confirm the statements that she made out there. 'Did your boyfriend do this?' She nodded her head, 'Yes.'
>
> And then, she went on to tell him about having been at the movies, with the defendant; that he was going back to her apartment; driving down Rea Road. *She couldn't understand why he stopped, in the middle of the road."*

(1/15/01 Tpp. 324-325) He returned to the surgeon, to argue Adams was "oriented and alert" when the notes were written, and to the nurse, who says "from her observations, [Cherica is] mentally alert." (1/15/01 Tp. 326)

> She had two things on her mind; two priorities. She was focused. 'You tell me, is my baby alive; and, I'll tell you what that man did to me.' And, she started giving the signal that she wanted to write.
>
> Nurse Willard got the pad and she wrote; and *she told us what that man did to her."*

(1/15/01 Tp. 327) In short, the focus of this argument, right from the start, was on the statements respondent now argues did not have a substantial and injurious influence the jury. For over ten pages the prosecutor repeated Adams' statements, over and over, asking the jury to believe what "Cherica has told us."

Even later in the argument, when talking about Kennedy and Watkins, the prosecutor again came back to the same theme: "What they said is *what Cherica told you*, at the very beginning, about what happened on Rea Road." *Id*. at 343 (emphasis added). And, when talking about the phone records of calls made that night, he again referred to the hospital notes written by Adams: "*She told you through these notes*. 'Before we left the house, he called

37

someone and said we're leaving now. We're leaving now.'" (1/15/01 Tp. 352)

Thus, the state used the notes explicitly to give context and ascribe importance to facts, such as phone records, that were otherwise ambiguous. Even the 911 call, which had great visceral impact, was substantially enhanced by the evidence of what Adams said to the police and to the nurse later. For example, the statement in the 911 call that she was following Carruth when "*he slowed down. And a car pulled up beside me,*" which was ambiguous by itself, was made much more ominous by her later statements about him stopping and blocking her in.

In summary, the prosecutors focused heavily on Adam's statements: the statements she made at the scene, the statements she made at the emergency room, and the statements she made after her surgery. They focused on Adams' statements, and her role as an eyewitness, at the very start of the case, in their opening statement. They asked about her statement at the scene when they called their first substantive witnesses, Nicole Michaels. (11/20-21/00 Tp. 123) They asked repeatedly about the notes she wrote at the hospital during a lengthy direct of the very next witness, Traci Willard. (11/20-21/00 Tpp. 196-229) After the nurse's testimony, the prosecutors focused the jury's attention on the hospital notes by asking other witnesses about the circumstances in the hospital when the notes were written. These included her cousin, Modrey Floyd, (11/20-21/00 Tp. 321) and her father, Jeffery Mooney, (11/20-21/00 Tp. 344) They focused on her statements at the scene and at the emergency room through the testimony of the person who questioned her, Officer Grant. (11/29/00 Tpp.

196-202)  And finally, they repeatedly focused on her statements, which they characterized as her testimony "to the jury," in their closing argument, spending about a quarter of their time (ten transcript pages out of forty) specifically talking about what Adams had said to the officer or had written for the nurse.  All this testimony and argument was designed to do one thing: have a substantial impact on the jury.  Respondent cannot carry its burden of proving that the statements and its arguments did not have precisely the effect the prosecutors desired.

6.    **The Jury had a Difficult Time Reaching a Verdict, Even With all the Cherica Adams Statements Admitted Into Evidence.**

Even with all the statements made by Adams, and the prosecutor's arguments about those statements, the jury struggled to reach a verdict in this case.  The jury began deliberating on January 16, and did not reach a verdict until January 19.  During the deliberations, the jury sent out a note that read:

> We have voted on all four charges.  *We currently are split on every charge.*  We have discussed all issues several times, and are *at an impasse*.  We need instruction on what to do at this point."

(01/17/01 Tpp. 570-571)  After the trial court instructed the jury on continuing their deliberations, it took the jury another full day to reach a verdict.  Even then, the verdicts were clearly a compromise: not guilty of murder, guilty of conspiracy to commit murder, guilty of discharging a firearm into occupied property, and guilty of using an instrument with the intent to destroy an unborn child.  Given these factually inconsistent verdicts, and the difficulty the jury had in reaching any verdict at all, respondent certainly cannot carry its burden of proving

39

that the statements of Adams, and their arguments based on those statements, did not have a substantial and injurious affect in the trial.

**B.     The Admission of Cherica Adams' Testimony Affected the Reliability of the Evidence Before the Jury and Influenced the Compromise Verdict.**

Most importantly, none of Adams' statements, which the state repeatedly described at trial as "eyewitness" evidence, was subjected to any testing of its reliability through cross examination.   The constitutional right to cross-examination is a "bedrock procedural guarantee," as Justice Scalia noted in *Crawford v. Washington*, 541 U.S. 36, 42 (2004). *Crawford* reconsidered and rejected the notion that merely because evidence can be deemed reliable suffices to supplant the constitutional right to confront one's accusers.  *Id*. at 42, 60-61) "[T]he principal evil at which the Confrontation Clause was directed was the . . . use of ex parte examinations as evidence against the accused." *Id*. at 50.  With this notion firmly in mind, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable, and the defendant had had an opportunity for cross-examination.  The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts." *Id*. at 53-54.  Indeed, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  *Id*. at 68.

Cross-examination is, as Dean Wigmore cogently observed, "the greatest legal engine invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970).  Face-to-face confrontation provides the accused with an opportunity to test the recall and sift the

conscience of the accuser while "compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242-43 (1895). Carruth never had that opportunity with respect to the most important evidence against him: the voice that, according to the prosecutor, was "still here." Cherica Adams "voice, saying to you 'Rae Carruth did this. He did it.'" (1/15/01 Tp. 318)

**C.** **No Deference is Due the North Carolina Courts' Harmless Error Analysis, Because no North Carolina Court has Ever Considered the Impact of *all* of Cherica Adams' Testimony on the Jury.**

This case comes to federal habeas in a unique posture. Two different state courts, at two separate times, have held that the trial court's admission of three different statements by Adams violated Carruth's constitutional right to confront and cross-examine the witnesses against him. On direct appeal, the North Carolina Court of Appeals held the admission of her statements after surgery was unconstitutional, but concluded the error was harmless because the same evidence came in through Officer Grant's testimony about statements Adams made to him at the scene and at the hospital emergency room. After the United States Supreme Court's decision in *Crawford*, the state post-conviction court in conducting a hearing on Carruth's motion for appropriate relief, held the admission of her statements to Officer Grant at the scene and at the hospital before surgery were unconstitutional. He concluded that the admission of these particular statements was harmless. However, *he specifically refused to analyze the impact on the jury of all three statements, taken together,* because he concluded

Case 3:05-cv-00346-GCM   Document 26   Filed 05/06/08   Page 41 of 63

he could not "overrule" the harmless error ruling on the hospital notes of the North Carolina Court of Appeals - something he was not being asked to do.

Thus, no state court has ever analyzed the cumulative impact of all three of these statements on the jury to determine if the admission of all three, taken together, was harmless. This task therefore falls to this Court. Under *Fry v. Pliler*, the proper inquiry is whether the state can carry its burden of proving that the unrebutted and uncontradicted words of the victim before she died, repeated and emphasized over and over again by the state, did not have the precise effect the state intended - a "substantial and injurious influence" in determining the jury's verdict.

As explained fully in petitioner's initial memorandum, and again above, there can be no doubt that the words of the victim, repeated over and over again by the prosecutors, had a very substantial influence on the jury's verdicts. Indeed, the state put an extraordinary amount of weight on those statements at trial, arguing that Adams herself was an eyewitness who had "testified" to the jury through her notes and statements, and urging them to believe her. Undoubtedly, the deceased victim's words ringing in the jury's ears carried an awesome power. And the prosecutors played it for all it was worth.

Yet even with all of Adam's statements before them, the jury struggled mightily to reach a verdict. After two full days of deliberation, they reported that they were hopelessly deadlocked. After the judge re-instructed and sent them out to deliberate further, they came back with a compromise verdict - not guilty of murder, but guilty of conspiracy and two lesser

42

offenses. Under these circumstances, to say the state carried its burden of proving that the three different statements heard by the jury, taken and considered together as a whole (as no state court has yet done) did not "substantially influence" the jury's verdict is to ignore what the prosecutors so successfully accomplished during the trial.

Respondent seems to argue almost no constitutional error can be harmful under the test in *Brecht*. [Respondent's Supporting Brief at 63-64] But this position vastly overstates what *Brecht* requires. As Justice Stevens made clear in his concurring opinion, which provided the pivotal fifth vote in *Brecht,* the standard in the decision

> places the burden on prosecutors to explain why those errors were harmless; requires a habeas court to review the entire record *de novo* in determining whether the error influenced the jury's deliberations; and leaves considerable latitude for the exercise of judgment by federal courts.

507 U.S. at 640-641. Thus, "[t]he habeas court cannot ask only whether it thinks the petitioner would have been convicted even if the constitutional error had not taken place." *Id*. at 642. "It requires a reviewing court to decide that 'the error did not influence the jury' . . . and that 'the judgment was not substantially swayed by the error.'" *Id*. (citations omitted). The question is not

> were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had *or reasonably may be taken to have had* upon the jury's decision.. . . *This must take account of what the error meant to them*, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the

important difference, but one easy to ignore when the sense of
guilt comes strongly from the record.

*Id*. at 642-43 (citations omitted) (emphasis added).

That is precisely what respondent asks this court to do. Quoting selectively from trial testimony that was either conceded, of marginal relevance to the key issues, or essentially refuted by cross examination or the admission of inconsistent evidence, respondent attempts to create "a sense of guilt" from the record. Yet it totally ignores what the prosecutors knew all too well: that the words of the victim would ring in the jurors ears long after all the other evidence went silent. This Court should reject respondent's attempt and acknowledge the reality of what the prosecutors accomplished by presenting and emphasizing Adams' uncross-examined statements to the jury.

Petitioner is aware there may be a temptation to conclude that since he was acquitted of first degree murder, avoided the death penalty and life in prison, and was "only" convicted of conspiracy to commit murder and lesser offenses, he was fortunate and deserves no more. But this temptation must be resisted. He was and is entitled to the full protection of the Sixth Amendment and its guarantee that he not be convicted of any offense unless provided with the opportunity to confront the witnesses against him.

In this regard, the constitutional error here is not some mere technicality. It affected the very reliability of the evidence to which the jury was subjected. As *Crawford* emphatically stated, "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what

the Sixth Amendment prescribes." *Crawford*, 541 U.S. at 62. The most important and damning evidence against Carruth came from Adams through her three statements, neither of which was ever subjected to the crucible of cross-examination.

Finally, this Court must not forget this case was exceedingly close and undoubtedly resulted in a compromise verdict. The length of deliberations, and the presence of an impasse during those deliberations, are factors that must be taken into account in determining whether Respondent has met its burden of showing that Adams' statements did not substantially affect the verdict. *See, e.g.*, *Powell v. Collins*, 332 F.3d 376, 401(6th Cir. 2003) (finding prejudicial error in a habeas case in part because the jury at one point told the court that it was "at a stalemate"); *United States v. Varoudakis*, 233 F.3d 113, 127 (1st Cir. 2000) (noting, in weighing harmlessness, that "the jury's 'impasse' note reveals uncertainty about [the defendant's] guilt"); *Medina v. Barnes*, 71 F.3d 363, 369 (10th Cir. 1995) (basing prejudice determination in a habeas case in part on the fact that "at one point during their deliberations, the jurors indicated that they might be unable to reach a unanimous verdict"). And, of course, in this case, in addition to a lengthy deliberation that involved an impasse, the jury actually found Carruth *not guilty* of murder.[31]

---

[31] This reality is also the short answer to respondent's forfeiture argument [Respondent's Supporting Brief at 64-70], which was explicitly rejected by the state court. Given the weakness of the case against Carruth absent Adams' statements, it is the essence of bootstrapping to say he somehow forfeited his right to cross-examine her because he murdered her, especially in a case in which the jury found him not guilty of the murder.

45

Taken and considered together, and given the continual emphasis placed on Adams' statements throughout petitioner's trial, the importance of those statements to the state's theory at trial, the substantial impeachment of the state's other witnesses, the strength of the defense, the length of the deliberations, the impasse that existed during the deliberations, and the not guilty verdict on first degree murder, respondent cannot carry its burden of proving that the admission of these statements did not substantially affect the compromise verdict the jury finally reached. This Court must issue a writ of habeas corpus setting aside Rae Carruth's convictions.

**CLAIM THREE: THE STATE COURT RULING THAT THE ADMISSION OF PORTIONS OF A 911 CALL THAT REFLECT ANSWERS TO SPECIFIC QUESTIONS DESIGNED TO FIND OUT WHAT HAPPENED DID NOT VIOLATE CONFRONTATION WAS AN UNREASONABLE APPLICATION OF *CRAWFORD*.**

After finding that the statements made by the victim to a police officer were "testimonial" under *Crawford*, the state post-conviction court reached the opposite conclusion with regard to various statements she made to the 911 operators. It held the questions posed by the operators were not structured and the resulting statements were not "testimonial." This legal conclusion is an unreasonable application of *Crawford*.

Subsequent to the state court's application of *Crawford* to the 911 call in this case, the Supreme Court of the United States provided further guidance on the issue, particularly whether statements made by a victim in a 911 call are testimonial or non-testimonial. *See Davis v. Washington*, 547 U.S. 813 (2006). In *Davis*, the victim, Michelle McCottry, called 911, but hung up before she spoke. The 911 operator called back immediately, and spoke

46

with McCottry as follows:

| | | |
|---|---|---|
| 911 Operator: | Hello. |
| McCottry: | Hello. |
| 911 Operator: | What's going on? |
| McCottry: | He's here jumpin' on me again. |
| 911 Operator: | Okay. Listen to me carefully. Are you in a house or an apartment? |
| McCottry: | I'm in a house. |
| 911 Operator: | Are there any weapons? |
| McCottry: | No. He's usin' his fists. |
| 911 Operator: | Okay. Has he been drinking? |
| McCottry: | No. |
| 911 Operator: | Okay, sweetie. I've got help started. Stay on the line with me, okay? |
| McCottry: | I'm on the line. |
| 911 Operator: | Listen to me carefully. Do you know his last name? |
| McCottry: | It's Davis. |
| 911 Operator: | Davis? Okay, what's his first name? |
| McCottry: | Adrian |
| 911 Operator: | What is it? |
| McCottry: | Adrian. |
| 911 Operator: | Adrian? |
| McCottry: | Yeah |
| 911 Operator: | Okay. What's his middle initial? |
| McCottry: | Martell. He's runnin' now. |

*Davis*, 547 U.S. at 817-18. At this point, McCottry told the operator Davis had just "ru[n] out the door" and was "leaving in a car with someone else." *Id.* As McCottry continued to talk, the 911 operator cut her off and said, "Stop talking and answer my questions." *Id.* at 818. The operator then asked more questions about Davis, eliciting his birthday and that he had asked to come into the house "to get his stuff" because McCottry was moving. *Id.*

Davis was convicted at trial by use of the entire 911 call. McCottry did not testify at the trial. In this fact pattern, *Davis* interpreted *Crawford* as follows:

47

> Without attempting to produce an exhaustive classification of all
> conceivable statements-or even all conceivable statements in
> response to police interrogation-as either testimonial or
> nontestimonial, it suffices to decide the present cases to hold as
> follows: Statements are nontestimonial when made in the course
> of police interrogation under circumstances objectively indicating
> that the primary purpose of the interrogation is to enable police
> assistance to meet an ongoing emergency. They are testimonial
> when the circumstances objectively indicate that there is no such
> ongoing emergency, and that the primary purpose of the
> interrogation is to establish or prove past events potentially
> relevant to later criminal prosecution.

*Davis,* 547 U.S. at 822. It further explained, "The question before us in *Davis,* then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements." *Id*. at 827.

The Supreme Court held that McCottry's statements up to and including the point at which she told the operator that Davis had left the premises in a car were non-testimonial, and thus admissible against Davis. " . . . McCottry was speaking about events *as they were actually happening,* rather than 'describ[ing] past events. . . .' Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency." *Id*.

According to *Davis*, the framework under *Crawford* is to focus on what the 911 operator asked and how the responder answered. Using this approach and "viewed objectively," the 911 operator began by asking questions to elicit statements that were "were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish

48

the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon." *Id.* (citing *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt City*, 542 U.S. 177, 186 (2204))  The Court concluded "that the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 827-28.

The Supreme Court, however, warned that a conversation which starts as an interrogation to determine the need for emergency assistance can "evolve into testimonial statements once that purpose has been achieved." *Id*. at 828.

> In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford*, 541 U.S. at 53 n.4.

*Id*. at 828-29.

This is exactly what happened in Carruth's case.  At first,  the 911 operator and the Medic operator (both were talking to Adams during the phone call) asked questions  to elicit her location and her medical condition. (11/20-21/00 Tpp. 102-107)  But then the medic switched gears, and asked this question: "MEDIC: Okay.  How did this happen?"  (11/20-21/00 Tp. 107)  The primary purpose of this question clearly was to elicit from Adams the equivalent of testimony about *how* the shooting had occurred.  The medic did not ask, "Where is the shooter?"  The medic did not ask, "Is the person who attacked you still there with you?"

These would have been questions meant to elicit information that would help police deal with an emergency situation, *i.e.* to discover if the attacker was still at the scene. Instead, the medic's question had "the primary purpose . . . to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 823. This scenario fits the definition of a testimonial statement, meaning the admission of this evidence against Carruth violated his constitutional right to confrontation.

In fact, the medic's question did elicit an answer from Cherica Adams that caused her to be a declarant within the meaning of the Confrontation Clause:

| | |
|---|---|
| Medic: | Okay. How did this happen? |
| Caller: | I was following my baby's daddy, Rae Carruth the football player. |
| Medic: | So you think he did it? |
| Caller: | He slowed down. And, a car pulled up beside me. |
| Medic: | And then shot at you. |
| Caller: | Yes. |
| Medic: | Okay. What's that horn blowing? |
| Caller: | Me, trying to get attention. |
| Medic: | To get somebody to come out? |
| Caller: | And before – and before we left, he called somebody from his house. |

This line of questioning, although it came from Medic, is standard police interrogation aimed at eliciting a testimonial statement by Adams.[32] And the statement by Adams is standard response to police interrogation.

---

[32]     In the middle of this questioning, Adams begins honking the horn of her car repeatedly – she is understandably more concerned with trying to give information that would help solve her need for immediate medical help, *i.e.* trying to get a neighbor to come out and perhaps help the 911 service find her location.

50

Unlike the 911 call in the *Davis* case, where there was a specific time at which McCottry's statements switched from non-testimonial to testimonial, in Carruth's case, the questioning by the 911 operator and the medic, and Adams' responses weave back and forth between testimonial and non-testimonial.

The medic shifts his questioning of Adams back to trying to find out if the attacker was still at the scene:

| | |
|---|---|
| Medic: | Where's your husband at? |
| Caller: | I don't have one. |
| Medic: | Or your boyfriend?  The one that you said was with you.  Where's he at? |
| Caller: | He was in the car in front of me and he slowed down and somebody pulled up besides me and did this. |
| Medic: | And then where'd he go? |
| Caller: | He just left. |
| Medic: | Okay.  All right.  What's his name? |
| Caller: | Rae Carruth, he plays for the Panthers. |
| Medic: | Okay.  What's his name? |
| Caller: | Rae Carruth. |
| Medic: | Rae Carruth? |
| Caller: | Number 89.  Please help me. |
| Medic: | Okay.  Are you controlling your bleeding? |
| Caller: | No. |

(11/20-21/00 Tp. 108)

At this point, medic and the 911 operator have found out that the attacker is no longer at the scene with Adams.  The medic then shifts the questioning of Adams to her current medical condition, and to her location.  (11/20-21/00 Tpp. 109-10)  These statements are clearly non-testimonial.

51

But then the medic returns to questions seeking a narrative, testimonial response, even though the answers sought will not help the police dispatch or medic to find Adams and treat her wounds.

| | |
|---|---|
| Medic: | Okay. Do you know what kind of car he drove? |
| Caller: | Who, Rae? |
| Medic: | Yes. |
| Caller: | He's in a black Expedition. |
| Medic: | Black Expedition? |
| Caller: | I mean white Expedition. |
| Medic: | A white Expedition? |
| Caller: | MSN something, something. |
| Medic: | Where does he live? |
| Caller: | 94, 9214 Olivia Lane. |
| Medic: | 9214 Olivia |
| Caller: | I think. |
| Medoc: | You know anything else about the Expedition? Tag number? Or part of it? |
| 911: | Medic. |
| Caller: | MSN something, something 77. |

(11/20-21/00 Tpp. 110-11)

These questions, seeking background information on the attacker that could later help the police solve the crime, have the primary purpose of eliciting testimony from Adams. This "structured police questioning" seeks a description of the attacker's vehicle, it's license plate number, and his address. Under *Davis*, "trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial . . . . [and] [t]hrough *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial . . . ." *Davis*, 547 U.S. at 829. The state trial court did not do so here, and the state appellate court did not correct the error.

52

The last section of the 911 call that should have been redacted is the clearest example of "structured police questioning." The 911 operator, in very apologetic language, interrupts the medic's ongoing effort to get Adams to try to stop her bleeding and asks Adams to state where she last saw the suspect heading:

| | |
|---|---|
| Medic: | Ma'am. How you doing? Are you controlling the bleeding? |
| Caller: | No. |
| Medic: | You need to put your hand over it and hold direct pressure. |
| 911: | Ma'am. I hate to do this to you. But, when you last saw this Ford, when you last saw this car, which way was it going? What road? |
| Caller: | Straight down Rea Road. |
| 911: | Rea Road. Towards South Carolina? |
| Caller: | No. |
| 911: | Towards town? |
| Caller: | Yes |

(11/20-21/00 Tpp. 112) The primary, if not the only, purpose of this set of questions was not seeking to determine what was happening to Adams at that very moment, but rather "was to investigate a possible crime" and therefore Adams' responses were testimonial. *Davis*, 542 U.S. at 830.

*Davis* explained that statements in response to police questioning as to "how potentially criminal past events began and progressed" and made "after the events described were over" are testimonial in nature. *Id.* "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial. *Id.* (emphasis in original).

53

As explained in detail in Claim Two, the state courts unreasonably applied established federal law, espoused in *Crawford*, in approving the admission of the 911 call. Because of the singular importance of the words uttered by Adams in this telephone call, particularly given her emotional condition, the denial of the right to confront this accuser constituted error. Standing alone, and certainly in tandem with the inadmissible, unconfronted statements discussed in Claim Two, this constitutional error had a substantial and injurious effect on the trial. *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). Accordingly, this Court must issue a writ of habeas corpus.

## CLAIM FOUR: THE NORTH CAROLINA COURTS UNREASONABLY APPLIED *RING v. ARIZONA* and *APPRENDI v. NEW JERSEY* TO FIND RAE CARRUTH'S SENTENCE WAS NOT UNCONSTITUTIONAL.

In rejecting Rae Carruth's challenge to his sentence, the state courts unreasonably applied clearly established federal law. *See* 28 U.S.C. §2254(d)(1). On direct appeal, Carruth argued the state had failed to offer sufficient evidence to prove the aggravating factor that he abused a position of trust in order to commit the crimes. The North Carolina Court of Appeals rejected this claim by concluding the state had proved this factor by a preponderance of the evidence. *State v. Wiggins*, 152 N.C. App. 252, 269, 584 S.E.2d 303, 316, *disc. rev. denied*, 357 N.C. 511, 588 S.E.2d 472 (2003), *cert. denied*, 541 U.S. 910 (2004). In doing so, the state appellate court applied an incorrect and, indeed, unconstitutionally low burden of proof. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)

In his motion for appropriate relief, Carruth also argued the sentence was unconstitutional because the jury rather than the trial judge should have made the finding as to the existence of aggravating factors. The state post-conviction court rejected this claim. Although it concluded that the North Carolina sentencing scheme was unconstitutional, it determined that the prevailing cases could not be applied retroactively. This determination was also unreasonable. *See United States v. Hammoud*, 381 F.3d 316, 348 (4th Cir. 2004) (*en banc*).

Carruth received the maximum aggravated sentence on both the conspiracy conviction and on the discharging a firearm conviction, based on the sentencing court finding, by a preponderance of the evidence, two aggravating factors: (1) petitioner "occupied a position of leadership or dominance of other participants in the commission of the offense," and (2) petitioner "took advantage of a position of trust or confidence to commit the offense." The trial judge then ran these two aggravated sentences consecutively, resulting in a sentence that was far in excess of the statutory limit applicable without these judicial findings.[33] Carruth timely objected to the aggravated sentences on the ground that the factual findings made by the judge were not supported by the evidence.

---

[33] Although Respondent claims that the sentencing court ran the sentences on all three convictions consecutively, this is not accurate. The convictions for discharging a firearm and for using an instrument to injury an unborn child were consolidated for judgment, and the sentences were run concurrently with each other, and consecutive to the sentence for conspiracy to commit murder.

Case 3:05-cv-00346-GCM   Document 26   Filed 05/06/08   Page 55 of 63

The gravamen of Carruth's claim that his sentence is unconstitutional is, therefore, two-fold. First, the sentencing court unconstitutionally found the state proved its two aggravating factors by a preponderance of the evidence, rather than beyond a reasonable doubt. Second, these two aggravating factors were found by a judge rather than a jury. [Habeas Petition at 38-42] The first portion of this claim is based on the due process right to have elements proved beyond a reasonable doubt. The second portion of this claim is based on the right to trial by jury. Respondent ignores the first and most important portion of the claim, choosing to deal only with the second aspect of the issue. [Respondent's Supporting Brief at 84-90] This omission is hardly surprising because, at the time the trial court imposed the aggravated sentence on Carruth, the Fourteenth Amendment due process right to have facts proved beyond a reasonable doubt was settled, including "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490; *see Ring v. Arizona*, 536 U.S. 584 (2002) (applying *Apprendi* and holding death penalty could only be imposed if aggravating factor proven to a jury rather than to a judge).

*Apprendi* was based on both the Sixth Amendment right to have a jury determine such facts, *and on the due process right to have such facts determined beyond a reasonable doubt*. This Fourteenth Amendment guarantee "plays a vital role in the American scheme of criminal procedure" as the "prime instrument for reducing the risk of convictions resting on factual error" and the "concrete substance for the presumption of innocence." *In re Winship*, 397

56

U.S. 358, 363 (1970). This safeguard does not end upon a conviction but continues to govern the process that determines "the consequences resulting from a verdict . . . ." *Mullaney v. Wilbur*, 421 U.S. 684, 698 (1975). Just as this standard of proof protects against wrongful convictions, it also guards against improperly aggravated sentences.

Respondent concedes Carruth's sentence became final on 8 March 2004, when the Supreme Court of the United States denied his petition for a writ of certiorari. [Respondent's Supporting Brief at 86] At that point, the legal landscape was clear. Any fact other than a prior conviction that might constitute an aggravating factor necessary to enhance a sentence above the maximum possible non-enhanced sentence available for the crime of conviction had to be proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490; *see Blakely v. Washington*, 542 U.S. 286 (2004). *Blakely*, decided after Carruth's case became final, merely confirmed this scenario. *Blakely*, 542 U.S. at 303. Indeed, former Justice O'Connor confirmed this conclusion when she mused, "all criminal sentences imposed under the federal and state guidelines since *Apprendi* was decided in 2000 arguably remain open to collateral attack" under *Teague v. Lane*, 489 U.S. 288, 311 (1989) Thus, the rule in *Blakely* as applied to Carruth is not "new" within the meaning of *Teague*.

In *Blakely* itself, Justice Scalia's opinion cited *Ring* for the proposition that "[o]ur precedents make clear . . . that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 536 U.S. at 597. Given this language, it is clear that,

at a minimum, *Blakely* was "dictated" by *Ring*. *Blakely* specifically applied *Apprendi* to find it unconstitutional for a judge to make factual findings, using a preponderance of the evidence standard, that increase the permissible punishment under a state sentencing statute. In doing so, "*Blakely* did not change – indeed, it reaffirmed – . . . the rule of *Apprendi* . . . . [*Blakely*] adhered to the rule the Court had announced in *Apprendi*." *Hammoud*, 381 F.3d at 348.

This straightforward application of *Apprendi* was all that was necessary to decide *Blakely*. In 2001, the Kansas Supreme Court unanimously invalidated the procedures in the Kansas Sentencing Guidelines for imposing aggravating sentences, accepting that "[u]nder *Apprendi*," the relevant statutory maximum is the maximum punishment "authorized by the jury verdict." *State v. Gould*, 23 P.3d 801, 812 (Kan. 2001). Neither the *Blakely* majority nor any of the dissenters so much as hinted otherwise; their only disagreement was on the merits of the *Apprendi* decision itself. Since *Blakely* did not establish any "new rule" for defendants sentenced after *Apprendi*, no retroactivity analysis is necessary for such defendants.

But even if application of *Blakely* to Carruth implicates retroactivity concerns, the rule in *Blakely*, at least in terms of the principle that aggravating factors must be proved beyond a reasonable doubt and not merely by a preponderance of the evidence, is a bedrock rule of constitutional law entitled to retroactive application at least to the date of *Apprendi*. Applying *Teague* requires three considerations. First, the date defendant's conviction became final must be determined. Second, the "legal landscape as it then existed" must be assessed to see

58

if the principle is actually "new." Third, if the rule is new, the court must decide if it fits within one of the two exceptions under *Teague*. *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997). Under *Teague*, "a new rule will be applied retroactively if it is a 'watershed rule of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *See also Williams v. Dixon*, 961 F.2d 448, 456 (4th Cir.), *cert. denied*, 506 U.S. 991 (1992) ( "bedrock procedural" rule "implicit in the concept of ordered liberty" must be applied retroactively). The rule in *Apprendi*, as applied in *Blakely*, fits this second *Teague* exception. It is a watershed rule of criminal procedure affecting the fundamental fairness of the criminal proceeding because it alters the burden of proof the prosecution must shoulder in obtaining a sentence above the presumptive term under the structured sentencing scheme.

Respondent's cites *Schiro v. Summerlin*, 542 U.S. 348 (2004), for a contrary position [Respondent's Supporting Brief at 88], but this reliance is misplaced. *Schiro* addressed only the right to a jury trial involved in *Apprendi*, holding it was merely a new procedural protection rather than a new rule of constitutional law. The issue here involves the constitutional right to have an aggravating factor *proved beyond a reasonable doubt*. The latter protection implicates fundamental fairness and the accuracy of trial and sentencing results. As such, it is a watershed rule of constitutional law that is fully retroactive. *See Hankerson v. North Carolina,* 432 U.S. 233 (1977) (holding *Mullaney v. Wilbur* retroactive); *Ivan V v. City of New York*, 407 U.S. 203 (1972) (holding *In re Winship* retroactive). In addition, the cases upon which respondent relies for the proposition that *Blakely* does not fit

Case 3:05-cv-00346-GCM   Document 26   Filed 05/06/08   Page 59 of 63

the *Teague* exceptions all focus on the right to a jury trial, not the constitutionally required burden of proof. [Respondent's Supporting Brief at 88-89]

The Fourteenth Amendment principle in *Blakely* fits the second *Teague* exception. It is a watershed rule of criminal procedure affecting the fundamental fairness and accuracy of the criminal proceeding because it alters the burden of proof the prosecution must shoulder in obtaining a sentence above the presumptive term under North Carolina's structured sentencing scheme. The burden of proving facts in a criminal case beyond a reasonable doubt "plays a vital role in the American scheme of criminal procedure" and "is a prime instrument for reducing the risk of convictions resting on factual error." *Winship*, 397 U.S. at 363. The burden of proof embodies the presumption of innocence. Because it seeks "to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials" where it was not in force, the due process requirement that the government prove each element beyond a reasonable doubt "has been given complete retroactive effect." *Ivan V*, 407 U.S. at 204. This principle is "designed to diminish the probability" that a defendant "would more likely lose his liberty." *Hankerson*, 432 U.S. at 242. The retroactive application of both *Winship* and *Mullaney*, based upon their critical importance to the fundamental fairness and accuracy of the criminal proceeding, demonstrates that requiring this same burden of proof in the criminal sentencing process is a watershed rule of criminal jurisprudence implicating the fundamental fairness and accuracy of the criminal proceeding. *See Teague*, 489 U.S. at 311.

*Apprendi* prevents arbitrariness in sentencing by requiring that any fact (other than a prior conviction) used to impose a punishment in excess of the legislatively prescribed presumptive sentence be proved beyond a reasonable doubt. This rule guarantees greater accuracy in the sentencing process and seeks to avoid unwarranted and unacceptable disparity in sentencing that can arise when a judge can find an aggravating factor even though the state proves it merely by a preponderance of the evidence. The principle in *Apprendi,* which *Blakey* repeated, that a defendant's sentence cannot be raised above the outer limit of the presumptive range absent the state proving an aggravating factor beyond a reasonable doubt, is equally designed to avoid arbitrariness in criminal sentencing and is "implicit in the concept of ordered liberty." A rule altering the state's burden of proof for a factor necessary to enhance a defendant's sentence is a "watershed rule" that implicates the fundamental fairness of the criminal sentencing proceeding. Even under *Teague*, the *Blakely* rule must apply to Carruth.

In rejecting Carruth's constitutional challenge to his aggravated sentences, the state courts unreasonably applied clearly established federal law, as the Fourth Circuit noted in *Hammoud*. Moreover, the due process requirement that aggravating factors must be proved beyond a reasonable doubt is a watershed rule within the meaning of *Teague*, as demonstrated by *Hankerson* and *Ivan V*. Accordingly, this Court should issue a writ of certiorari and direct the state to grant Rae Carruth a new sentencing hearing.

61

## CONCLUSION

For the reasons stated herein, Rae Carruth respectfully requests that respondent's motion for summary judgment be denied, that a writ of habeas corpus issue granting him a new trial or at least a new sentencing hearing, or that the matter be set for an evidentiary hearing.

RESPECTFULLY submitted this the 6th day of May, 2008.

**RUDOLF WIDENHOUSE & FIALKO**

  /s/
David S. Rudolf; NCSB #8587
M. Gordon Widenhouse, Jr. NCSB #10107
Attorneys for Petitioner
312 West Franklin Street
Chapel Hill, NC 27516
Telephone: 919-967-4900
Telefax:     919-967-4953
dsrudolf@rwf-law.com
mgwidenhouse@rwf-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on 6 May 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following: Clarence J. DelForge, III; Mary Carla Hollis.

Respectfully submitted this the 5th day of May, 2008.


/s/
David S. Rudolf; NCSB #8587
M. Gordon Widenhouse, Jr. NCSB #10107
Attorneys for Petitioner
312 West Franklin Street
Chapel Hill, NC 27516
Telephone: 919-967-4900
Telefax:      919-967-4953
dsrudolf@rwf-law.com
mgwidenhouse@rwf-law.com

63