IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:05CV346-1-MU

RAE LAMAR WIGGINS,                    )
                                      )
            Petitioner,               )
                                      )
      v.                              )          **O R D E R**
                                      )
BUTCH JACKSON, Admin. Nash            )
      Correctional Inst.,[1]          )
                                      )
            Respondent.               )
_____)

**THIS MATTER** comes before the Court upon Petitioner's Memorandum in Support of

Petition for Writ of Habeas Corpus (Doc. No. 1), filed August 3, 2005; Respondent's Motion and

Memorandum in Support of Motion for Summary Judgment (Doc. Nos. 4-5), filed September 6,

2005; Petitioner's Response to Motion for Summary Judgment (Doc. No. 26), filed May 6, 2008;

and Respondent's Reply Brief (Doc. No. 27), filed May 7, 2008.

      Upon a review of the record, the arguments, and applicable authorities, the Court finds

that Respondent's Motion for Summary Judgment should be <u>granted</u> and Petitioner's § 2254

Petition for Writ of Habeas Corpus should be <u>dismissed</u>.

## PROCEDURAL HISTORY

      On January 11, 2001, in the Superior Court of Mecklenburg County, Honorable Charles

C. Lamm presiding, Petitioner was convicted, after trial by jury, of conspiracy to commit murder,

---

      [1] Mr. Jackson has replaced Ms. Boyette as Administrator of Nash Correctional Institution
and therefore replaces her as the Respondent in this case by operation of law.  Fed. R. Civ. P.
25(d)(1).

firing a gun into occupied property, and using an instrument with intent to destroy an unborn child.  Petitioner was sentenced to 196 to 245 months imprisonment for the conspiracy conviction plus two consecutive terms of 31 to 47 months for the remaining two convictions.  On August 5, 2003, the North Carolina Court of Appeals issued a published opinion finding no prejudicial error and on October 1, 2003, the Supreme Court of North Carolina denied discretionary review.  The United States Supreme Court denied certiorari on March 8, 2004, and a rehearing on May 3, 2004.  State v. Wiggins, 159 N.C. App. 252, disc. review denied, 357 N.C. 511 (2003), cert. denied, 541 U.S. 910, reh'g denied, 541 U.S. 1038 (2004).

On December 2, 2004, Petitioner filed a Motion for Appropriate Relief (MAR) in the Superior Court of Mecklenburg County.  After an evidentiary hearing, the court denied Petitioner's MAR in a detailed order filed on March 18, 2005.  State v. Wiggins, Nos. 99CRS100006, 99CRS46567, 99CRS46569, 99CRS50145, 2005 WL 857109 (N.C. Super. Mar. 18, 2005).  Petitioner then filed a certiorari petition in the North Carolina Court of Appeals on June 14, 2005, which was denied on July 6, 2005.  (Memo. Supp. Mot. Summ. J. Ex. 2, 14, 15.)

On August 3, 2005, Petitioner filed the instant federal habeas petition.  In his federal habeas petition, Petitioner alleges that: 1) the North Carolina courts, contrary to Supreme Court precedent, found that the prosecutors had not violated Petitioner's constitutional rights as set forth in Batson and its progeny;  2) the North Carolina courts unreasonably applied the harmless error rule in upholding Petitioner's conviction; 3) the state court ruling that the admission of portions of a 911 call did not violate the Confrontation Clause was an unreasonable application of Crawford v. Washington, 541 U.S. 36 (2004); and  4) the North Carolina court's ruling that Blakely does not apply to Petitioner's case is an unreasonable application of Blakely v.

2

<u>Washington</u>, 542 U.S. 296 (2004), <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), and <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).

## SUMMARY OF FACTS

The following facts are taken from the North Carolina Court of Appeals opinion. <u>State v. Wiggins</u>, 159 N.C. App. 252, 255-56, <u>disc. review denied</u>, 357 N.C. 511 (2003), <u>cert. denied</u>, 541 U.S. 910, <u>reh'g denied</u>, 541 U.S. 1038 (2004). On the evening of November 15, 1999, Petitioner and Cherica Adams ("Adams"), his eight-months pregnant girlfriend, watched a movie at a Charlotte theater. The two left the movie theater and rode together to Petitioner's house to retrieve Adams' car. While there, Petitioner called Michael Kennedy ("Kennedy") and told him that he and Adams were about to leave. Adams followed Petitioner in her vehicle toward her home. As they drove along two-lane residential Rae Road, Petitioner slowed or stopped his large sports utility vehicle in front of Adams' car. Kennedy then drove his rented vehicle beside Adams' car. Van Brett Watkins ("Watkins"), a passenger in Kennedy's car, fired five shots from the rental vehicle into Adams' car. Adams was wounded four times, once in the neck and three times in the back. Petitioner's and Kennedy's cars fled in different directions.

Adams called 911 from her cell phone at 12:31 a.m. and remained on the phone for twelve minutes until an ambulance arrived. During this phone call, Adams described the shooting in detail and informed the dispatcher and an emergency medical technician that she had been following Petitioner who was her boyfriend and her baby's father.

Mecklenburg police officer Peter Grant ("Grant") arrived on the scene at approximately 12:43 a.m. Adams informed Grant that Petitioner was the driver of the car that she had described in her 911 call. Adams was transferred to Carolinas Medical Center ("CMC"). At CMC, while

3

on her way to surgery, Adams gave Grant a complete chronology of the events that transpired

that evening. Emergency surgery was performed and Adams was then transferred to the trauma

intensive care unit and an endotracheal tube was inserted. Traci Willard ("Willard"), the

morning nurse, asked Adams if she remembered what had happened to her and Adams nodded

yes and motioned for a pen and paper. Adams then handwrote notes describing the shooting and

the events of the evening. Adams also indicated in response to a question from her father that

there were no stop sign in the road to explain Petitioner's sudden stop. Adams died on December

14, 1999, as a results of the injuries she sustained from the shooting.

Petitioner was charged with and tried capitally for the first-degree murder of Adams;

conspiracy to commit murder; discharge of a firearm into occupied property; and the use of an

instrument to destroy an unborn child. A jury found Petitioner guilty of conspiracy to commit

murder; discharge of a firearm into occupied property; and the use of an instrument to destroy an

unborn child.

## **LEGAL ANALYSIS**

### A. **STANDARD OF REVIEW UNDER 28 U. S. C. § 2254**

#### 1. **Applicable Law**

The threshold inquiries for a federal court reviewing a federal habeas petition are whether

the petitioner has exhausted his claims before the appropriate state courts and whether those

claims are procedurally barred. 28 U.S.C. § 2254. In order to exhaust a claim a petitioner must

have fairly presented it to the state courts. See Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir.

2000).

If a petitioner's claim is unexhausted, it may be treated as exhausted if it is clear that the

Case 3:05-cv-00346-GCM   Document 29   Filed 02/25/09   Page 4 of 47

claim would be procedurally barred under state law if the petitioner attempted to present it to the state court. See id. However, when the procedural bar that gives rise to exhaustion provides an independent and adequate state law ground for the conviction and sentence it prevents federal habeas review of the defaulted claim unless the petitioner can establish cause and prejudice for the default. See id.

If a petitioner's claims are exhausted and not procedurally barred, the federal court must next examine whether or not the petitioner's claims were "adjudicated on the merits" by the state court. If the claim was properly presented to the state court and the state court adjudicated it, the deferential standard of review set forth in 28 U.S.C. § 2254(d) applies. If a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim on the merits,[2] a federal court reviews questions of law and mixed questions of law and fact de novo. Weeks v. Angelone, 176 F.3d 249, 258 (4th Cir. 1999).

The standard of review set forth in § 2254(d) is to be applied to "all claims 'adjudicated on the merits,' that is, those claims substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." Thomas v. Davis, 192 F.3d 445, 455 (4th Cir. 1999). The standard of review is "quite deferential to the rulings of the state courts." Burch v. Corcoran, 273 F.3d 577, 583 (4th Cir. 2001). State court decisions are to be given the benefit of the doubt. Bell v. Cone, 543 U.S. 447, 455 (2005). This deference extends to summary dismissals. Fisher v. Lee, 215 F.3d 438, 446 (4th Cir. 2000). A habeas petitioner

---

[2] If the state court has not ruled on the merits of a claim because it has expressly denied a habeas petitioner's claim based upon an independent and adequate state procedural rule such claim is considered procedurally defaulted in federal court. See Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998).

bears the burden of establishing his claim. Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).

Pursuant to § 2254(d) a federal court may not grant a writ of habeas corpus unless the state court's adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding . . . ." 28 U.S.C. § 2254(d)(1) and (2).

The Supreme Court has explained that a state court adjudication is "contrary" to clearly established federal law, only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). An "unreasonable application" occurs when a state court correctly identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of a petitioner's case. Rompilla v. Beard, 545 U.S. 374 (2005)(citations omitted). An unreasonable application is different from an incorrect application of federal law, the former being the requisite showing. See Williams, 529 U.S. at 413; Schriro v. Landrigan, 127 S. Ct. 1933, 1939 (2007)("[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher burden.") Therefore, this Court may not issue the writ even if it concludes in its own independent review, that the relevant state court merely made an incorrect or erroneous application of the correct federal principles. Williams, 529 U.S. at 413.

When examining whether a state court's judgment "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in State court proceeding" a reviewing court must be mindful that a "determination of a factual issue made by a State court shall be presumed correct" unless a petitioner rebuts this presumption "by clear and convincing evidence." 28 U.S.C. § 2254(d)(2); 28 U.S.C. § 2254(e)(1); Lenz v. Washington, 444 F.3d 295, 300-01 (4th Cir. 2006).

## B.  BATSON/MILLER-EL CLAIMS

Petitioner alleges that the prosecutors at his trial unconstitutionally used peremptory challenges to exclude African-Americans, and in particular African-American males, from the jury.  (Mem. Supp. Pet. Writ Habeas Corpus 2-12.)

In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . ."  The Supreme Court subsequently explicitly extended the protection from intentional discrimination by state actors in the use of peremptory strikes to gender.  See J.E.B. v. Alabama, 511 U.S. 127, 143 (1994).  When a Batson challenge is made, the trial court must conduct a three-part inquiry.  First, the opponent of the challenge has to make out a prima facie case of discrimination.  Hernandez v. New York, 500 U.S. 352, 358 (1991).  Second, if a prima facie case is made, the burden shifts to the proponent of the challenge to come forward with a race-neutral explanation for the challenge.  Id.  The explanation need not be "persuasive or even plausible" as long as it is neutral.  Puckett v. Elm, 514 U.S. 765, 768 (1995)(citing Hernandez v. New York, 500 U.S. 352 (1991)).  Third, if parts one and two are satisfied, the trial court must then decide whether the opponent of the strike has proved "purposeful discrimination." Hernandez, 500 U.S. at 358.

7

In the instant case, the North Carolina Court of Appeals addressed both whether the trial court erred in allowing the peremptory strikes of black jurors and whether the trial court erred in failing to assess gender[3] or race-gender discrimination in the juror selection process.  State v. Wiggins, 159 N.C. App. 252, 256 disc. review denied, 357 N.C. 511 (2003), cert. denied, 541 U.S. 910, reh'g denied, 541 U.S. 1038 (2004).  Applying the test set forth in Batson, and recognizing that great deference is accorded to the trial court's determination, the court of appeals concluded that the prosecutors did not intentionally discriminate on the basis of race or gender, singularly or in combination.  Id. at 261-67.

In reaching this decision with regard to race, the appellate court considered "the race-neutral explanation by the prosecutor, the argument of pretext by the defendant, and the factors [north carolina appellate courts] have deemed relevant."  Id. at 265.  After conducting its analysis, the court of appeals concluded that the only factor supporting an inference of discrimination was the disproportionate number of prospective black jurors peremptorily challenged by the State.  Id.  The appellate court concluded that "where the only factor supporting an inference of discrimination is the State's heightened use of peremptory challenges against prospective black jurors, and other elements relevant to finding discrimination are not present, the trial court's determination, that the State did not purposefully discriminate on the basis of race, is not 'clearly erroneous.'"  Id. at 266.

In reaching this decision with regard to gender, the court of appeals disagreed with

_____

[3] While Petitioner uses the word "gender" alone, and the appellate court addresses a gender only claim, it does not appear to this Court that Petitioner is really challenging the use of peremptory challenges against prospective jurors on the basis of gender alone but only in combination with race (black males).

Petitioner's arguments that the trial court did not engage in the proper analysis of gender-based challenges and that the trial court failed to make an independent assessment of whether the challenges were motivated by gender. Id. To support its finding the appellate court cited to the trial court's Batson order which explicitly stated that "Defendant . . . failed to put forth a sufficient showing of purposeful discrimination on the basis of race or gender[]" Id. The appellate court also cited to findings of fact made by the trial court which indicated that the court had concluded that prospective jurors were not purposefully discriminated against based upon gender. Id.

In reaching this decision with regard to an alleged race-gender bias, the court of appeals considered the reasons given by the prosecutor as to why all four black males were peremptorily struck from the jury. Id. at 267. The court of appeals noted that Petitioner's assertion of discrimination was undercut by the fact that other non-black males were challenged for the same reasons and that such reasons were non-discriminatory. Id. The court of appeals then noted that the absence of other factors to establish purposeful discrimination diminished Petitioner's claim and ultimately concluded that the trial court's ruling on this issue was not clearly erroneous. Id.

Because the state court adjudicated Petitioner's Batson claim on the merits, in order to prevail on federal habeas review, Petitioner must establish that the state court's ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

As the Supreme Court has noted "[d]eference to trial court findings on the issue of

Case 3:05-cv-00346-GCM   Document 29   Filed 02/25/09   Page 9 of 47

discriminatory intent makes particular sense in this context because, as we noted in <u>Batson</u>, the finding 'largely will turn on evaluation of credibility.'" <u>Hernandez</u>, 500 U.S. at 365 (citing <u>Batson</u>, 476 U.S. at 98 n.1.)  The Supreme Court has also pointed out that "[t]here will seldom be much evidence bearing on that issue [of intent], and the best evidence often will be the demeanor of the attorney who exercises the challenge." <u>Id.</u>  A prosecutor's state of mind based upon demeanor and credibility lies "peculiarly within a trial judge's province." <u>Id.</u> (citations omitted).  Moreover, a trial court's ruling on the intentional discrimination prong is a factual determination which in a habeas corpus proceeding is presumed correct. <u>Id.</u> at 364; <u>see also</u> 28 U.S.C. § 2254(e)(1).

This Court will now address below each of Petitioner's arguments regarding his contentions that the North Carolina Court of Appeals unreasonably applied clearly established Supreme Court precedent and unreasonably determined the facts presented in state court.

### 1.  <u>Unreasonable Application of the Basic Standards of Batson</u>

Petitioner argues that in rejecting Petitioner's <u>Batson</u> claim the North Carolina Court of Appeals unreasonably applied clearly established Supreme Court precedent.  More specifically, Petitioner argues that the court of appeals unreasonably applied federal law when it "refused to engage in a comparative analysis of excused African-American venire members with similarly situated white venire members who were accepted by the prosecutors in deciding if the reasons given by the prosecutors were pretextual."  (Pet'r's Resp. Mot. Summ. J. 3.)  Petitioner asserts that "'side-by-side comparisons' of similarly situated African-American and white prospective jurors is a major consideration in the <u>Batson</u> analysis."  (Pet'r's Resp. Mot. Summ. J. 4.)

Contrary to Petitioner's assertion, a reading of the appellate court's opinion reveals that

the court of appeals did consider Petitioner's "side-by-side" comparisons when determining if Petitioner had established purposeful discrimination. In reaching a decision on the <u>Batson</u> issue, after noting that the trial court had found that a prima facie case had been established, the court of appeals set forth the prosecution's race-neutral explanation for striking each juror. <u>State v. Wiggins</u>, 159 N.C. App. at 264. Next the court of appeals set forth Petitioner's pretextual argument based upon comparisons of black and white jurors. <u>Id.</u> at 265. The court of appeals then turned to the third prong of <u>Batson</u>. When analyzing the third prong of <u>Batson</u>, the court of appeals explicitly stated that it was considering "the argument of pretext by defendant." <u>Id.</u> In addition, the appellate court noted in its opinion that the trial court had found as a matter of fact that the "State had acted "substantially the same with regard to each juror, regardless of that juror's race or gender" in questions and actions toward all prospective jurors." <u>Id.</u> at 266. Ultimately, however, the court of appeals concluded that "[t]he only factor supporting an inference of discrimination is the disproportionate number of prospective black jurors peremptorily challenged by the State." <u>Id.</u> The fact that the court of appeals rejected Petitioner's side-by-side analysis argument does not equate with the appellate court failing to give this argument due consideration.[4] Consequently, this Court finds no merit in Petitioner's argument that the state appeals court unreasonably applied <u>Batson</u> and its progeny because it refused to engage at all in a comparative analysis of the jurors.

---

[4] To the extent Petitioner raises this argument in the race-gender context, it is equally unavailing. The appellate court specifically noted that non-black male prospective jurors were challenged for the same reasons proffered by the State for challenges to black male prospective jurors. <u>Wiggins</u>, 159 N.C. App. at 267. In addition, the appellate court found "the absence of other factors to establish purposeful discrimination" on the basis of race-gender. <u>Id.</u>

11

## 2. **Unreasonable Application of Batson Re: Statistical Disparities**

Petitioner also argues that the North Carolina Court of Appeals unreasonably applied

Batson and its progeny when it failed to give appropriate weight to the statistical disparities

between challenges to prospective African-American jurors and prospective white jurors.

(Memo. Supp. Pet. Writ Hab. Corpus 4; Pet'r's Resp. Mot. Summ. J. 5-7.) Petitioner asserts

that the trial court found the prosecution's reasons to be race-neutral "without considering the

strength of petitioner's prima facie case or the percentages of African-Americans versus whites

struck by prosecutors . . . ." (Memo. Supp. Pet. Writ Habeas Corpus 2.) After highlighting the

fact that the prosecution used a far greater percentage of its peremptory challenges against

African-Americans than whites,[5] Petitioner argues that the court of appeals "defiantly ignored

these percentages." (Pet'r's Resp. Mot. Summ. J. 6.) Petitioner argues that the court of appeals

incorrectly placed a greater weight on the prosecutions failure to exercise all of its fourteen

peremptory challenges than on the statistical disparity.[6] (Memo. Supp. Pet. Writ Habeas Corpus

9.) In addition, Petitioner asserts that "the state appellate court all but ignored this statistical

---

[5] At the time of the Batson hearing, the prosecutors in the instant case had used peremptory challenges with seventy-three percent of otherwise qualified African-Americans compared with the thirteen percent rate at which the prosecution struck otherwise qualified white jurors. (Memo. Supp. Mot. Summ. J., Ex. 6, ¶ 5.)

[6] A review of the appellate opinion reveals Petitioner's mischaracterization of the court of appeals' analysis. While the court of appeals did recognize that one factor to consider in a Batson analysis under its state case law was whether the State had used all of its peremptory challenges, such factor was not given greater weight than the statistical disparity. Rather, it was one small fact, among many, noted by the court of appeals supporting its decision. Wiggins, 159 N.C. App. at 313. Moreover, while even a single use of a peremptory strike on the basis of race or gender violates Batson, it is reasonable for a court when making a determination on purposeful discrimination to consider the fact that a prosecutor did not use available peremptory challenges for all black venire people.

Case 3:05-cv-00346-GCM   Document 29   Filed 02/25/09   Page 12 of 47

disparity in its Batson analysis, saying that it alone would not suffice to overturn a trial court's determination that a prima facie case of discrimination had not been shown." (Pet'r's Resp. Mot. Summ. J. 6.)

Notwithstanding Petitioner's assertion to the contrary, the state appellate court did acknowledge the statistical disparity and did consider such disparity in its full analysis. Indeed, with regard to race alone the appellate court specifically noted that the "only factor supporting an inference of discrimination is the disproportionate number of prospective black jurors peremptorily challenged by the State." Wiggins, 159 N.C. App. at 264. With regard to Petitioner's race-gender Batson claim, the state appellate court noted that the prosecution had challenged all four black males but concluded that the absence of other factors to establish purposeful discrimination diminished Petitioner's claim. Id. at 267. Given its finding of a lack of other evidence to support a finding of purposeful discrimination,[7] the appellate court, however, held that the trial court's determination that the State did not purposefully discriminate on the basis of race was not clearly erroneous. Id. at 266-67.

Again, the state appellate court's finding that the statistical disparity alone was insufficient to overturn the trial court's finding of no purposeful discrimination, does not equate with the appellate court failing to consider the statistical disparity in its analysis. Significantly,

---

[7] Petitioner repeatedly cites to the Miller-El cases to support his statistical argument. The evidence in these cases, however, went well beyond statistics. The majority in Miller-El specifically acknowledged that the statistics "while relevant, are not petitioner's whole case." Miller-El, 537 U.S. 322, 331 (2003). In Miller-El, among other things, it was established that the prosecutor's office had a long-standing policy of excluding blacks from jury service; the prosecution employed the "shuffle" system on four occasions when blacks appeared near the front of the venire; the prosecution made different inquiries of jurors; and the reasons offered by the prosecution were discounted by the Court. Miller-El, 537 U.S. 322 (2003).

13

Petitioner does not point to, nor is this Court aware of, any Supreme Court precedent[8] holding that a statistical disparity in similar proportion with the disparity found in this case, is alone sufficient to find purposeful discrimination.

### 3. Unreasonable Application of Miller-El: Disparate Juror Treatment

Petitioner also argues that the court of appeals erroneously applied Batson when the appellate court held that "where the only factor supporting an inference of discrimination is the State's heightened use of peremptory challenges against prospective black jurors, and other elements relevant to finding an inference of discrimination are not present, the trial court's determination . . . is not 'clearly erroneous'." (Pet'r's Resp. Mot. Summ. J. 10.)(citing Wiggins). Petitioner argues that this analysis contravenes a proper Batson analysis as set out by Miller-El, 537 U.S. 322 92003) and Miller-El, 545 U.S. 231 (2005)("Miller El II"). (Pet'r's Resp. Mot. Summ. J. 10.) Petitioner contends that the disparate treatment of similarly situated prospective jurors of different races was improperly disregarded as evidenced by the above-referenced quote. (Memo. Supp. Pet. Writ Habeas Corpus 5-8, 10-12.)

Petitioner appears to be arguing that Batson and its progeny were unreasonably applied because the appellate court refused to consider the discriminatory intent evidenced by a comparative juror analysis. Petitioner's argument is premised, however, on his conclusion that such an analysis supports a finding of purposeful discrimination. The state appellate court, however, clearly held that a comparative analysis did not support the conclusion that the

_____

[8] The United States Court of Appeals for the Fourth Circuit recently held that "[a]lthough [petitioner's] statistical evidence is certainly probative under Miller-El II . . . it alone cannot carry the day." Golphin v. Branker, 519 F.3d 168, 187 (4th Cir.), cert. denied, 129 S. Ct. 467 (2008).

14

prosecution purposefully discriminated on the basis of race in the use of its peremptory challenges.  Wiggins, at 265-66.  Consequently, Petitioner is really arguing that the state appellate court unreasonably determined the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(2); see also Rice v. Collins, 546 U.S. 333, 337-39 (2006).

When determining whether a state court unreasonably determined the facts, a federal habeas court must be mindful of the fact that state-court factual findings are presumed correct and a petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).  A federal court can only grant habeas relief if the state court's credibility determinations were objectively unreasonable based upon the record.  See Rice, 546 U.S. at 341 (a state court factual determination is reasonable in light of the evidence presented in state court where '[r]easonable minds reviewing the record might disagree on the factual finding.")  A federal court's "deference to trial court fact-finding is doubly great when considering Batson challenges because of the unique awareness [on the part of the trial court] of the totality of the circumstances surrounding voir dire."  Simmons v. Luebbers, 299 F.3d 929, 942 (8th Cir. 2002)(internal marks omitted).  In Snyder, the Supreme Court again reaffirmed that a trial court is best suited to evaluate a juror's demeanor as well as the prosecutor's demeanor.  Snyder v. Louisiana, 128 S. Ct. 1203, 1208 (2008).

At the outset, the Court notes that Petitioner criticizes the state trial court for failing to "closely review the transcript of the voir dire to determine if there was, for example, disparate questioning of blacks versus whites, or other indications of racial motivation in the jury selection process." (Mem. Supp. Pet. Writ Habeas Corpus 6. n.2.)  Petitioner also asserts that it is this Court's responsibility to independently review the voir dire transcript for any evidence that

would support Petitioner's contention that the prosecution engaged in purposeful discrimination. (Mem. Supp. Pet. Writ Habeas Corpus 6. n.2.)  Undoubtedly, the voir dire transcript is relevant to a <u>Batson</u> analysis and this Court has independently reviewed it, however, this Court is not an advocate.  It is primarily Petitioner's responsibility to analyze the voir dire transcript and provide argument and citations to the record supporting his claim.  Indeed, although Petitioner stated that he would submit a comprehensive analysis of the questioning of prospective black jurors as compared to the questioning of white juror,  (Mem. Supp. Pet. Writ Habeas Corpus 6. n.2.),  no such exhibit has been submitted to the Court.  The Court will address the arguments raised by Petitioner below.

In support of his assertion that a side-by-side analysis supports an inference of discrimination, Petitioner points to the State's use of a peremptory challenge on Ardurell Nimitz ("Nimitz") who the prosecution stated they dismissed because she had a son close in age to Petitioner and because she was a self-described team leader who might not respect the opinions of others."  (Trial  Tr. 11/07/2000, 156-57.)   Petitioner contends that the State did not challenge numerous white prospective jurors, such as Clark Pennell, Samuel Stewart, and Michael Hayes, who also had strong opinions and showed leadership skills.  (Mem. Supp. Pet. Writ Habeas Corpus 6.)  In addition, Petitioner asserts, without referencing any specific white juror, that "a number of white prospective jurors . . . had children close in age to the defendant" but were not challenged.  (Memo. Supp. Pet. Writ Habeas Corpus 5-6;  Pet'r's  Resp. Mot. Summ. J. 9.)

In the instant case, the state trial court specifically found the prosecution's race-neutral reason that Nimitz was dismissed because of her authoritarian demeanor to be supported by the

record.[9] (Memo. Supp. Mot. Summ. J.; Ex. 6 at ¶ 7.) As the Supreme Court has observed "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's first-hand observations of even greater importance." Snyder, 128 S. Ct. at 1208. While Petitioner supports his claim of purposeful discrimination by asserting that several other white jurors were also authoritarian and were not dismissed, he provides no further analysis than this generalization. (Memo. Supp. Pet. Writ Habeas Corpus 5-6; Pet'r's Resp. Mot. Summ. J. 8-9.) Petitioner has simply not carried his burden of establishing that the state appellate court's adjudication of this claim was based on an unreasonably determination of the facts in light of the evidence presented in the State court proceedings.

Petitioner also asserts that the prosecutor's race-neutral reason that Nimitz was challenged because she has a son approximately the same age as Petitioner is pretextual. (Mem. Supp. Pet. Writ Habeas Corpus 6; Pet'r's Resp. Mot. Summ. J. 9.) Petitioner, however, again, does not provide any support for his generalized assertion. Petitioner does not even provide the identities of these "comparable" white jurors or the precise ages of these unidentified jurors' children. Again, Petitioner has simply not carried his burden of establishing that the state appellate court's adjudication of this claim was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Petitioner also argues that the prosecution's assertion that he used peremptory challenges

---

[9] In it's Batson order the trial court specifically set forth that during the entire jury voir dire process [the court] has taken into account questions asked potential jurors by the State, the mannerisms of the State's attorneys when asking questions, and the manner generally in which they questioned all prospective jurors, all being substantially the same with regard to each juror, regardless of the juror's race or gender. The court also took into consideration the answers of and mannerisms exhibited by each of the challenged potential jurors. (Id. ¶ 4.)

17

with regard to Andrea McNeal, Steven Bethune, and Felicia Maxwell because of their equivocal

views on the death penalty does not withstand a comparative analysis. (Mem. Supp. Pet. Writ

Habeas Corpus 6; Pet'r's Resp. Mot. Summ. J. 9.) In support of his argument Petitioner notes

that the prosecution chose not to challenge any of these jurors for cause with regard to their view

on the death penalty. In addition, Petitioner asserts that "several white prospective jurors had

similar or more equivocal views about capital punishment, but the prosecutor accepted them."

(Mem. Supp. Pet. Writ Habeas Corpus 6; Pet'r's Resp. Mot. Summ. J. 9.)

In response to Petitioner's first argument, it is not atypical or unconstitutional for a

prosecutor to use a peremptory challenge on a juror who is equivocal about the death penalty but

not sufficiently equivocal to permit the use of a "for cause" strike. See Brown v. Dixon, 891

F.2d 490, 496 & n.13 (4th Cir. 1989)(holding that a prosecutor may properly use peremptory

challenges to create a jury inclined to impose the death penalty). Furthermore, Petitioner fails to

identify these allegedly comparable white jurors in any of his habeas filings.[10] Again, Petitioner

has simply not carried his burden of establishing that the state appellate court's adjudication of

this claim was based on an unreasonably determination of the facts in light of the evidence

presented in the State court proceedings.

Petitioner also criticizes the court of appeals for not discussing "any of these reasons or

the glaringly disparate treatment of similarly situated prospective jurors." Admittedly the court

---

[10] At the Batson hearing, Petitioner argued that a finding of pretext was supported by the
fact that two white jurors, Ms. Andrews and Ms. McCauley, who were strongly in favor of the
death penalty were not struck by the prosecution. (Memo. Supp. Mot. Summ. J., Ex. 5, 145-46.)
In such a situation, however, it would be defense counsel's decision as to whether such
individuals should be challenged.

of appeals did not conduct an in-depth analysis[11] in its opinion of side-by-side comparisons. Such analysis, however, is not necessary.  See Miller-El, 537 U.S. at 347 ("We adhere to the proposition that a state court need not make detailed findings addressing all evidence before it.")

In conclusion, at the very most, this Court can conclude that reasonable minds could differ as to whether Petitioner carried his burden with regard to proving purposeful discrimination.  See Rice v. Collins, 546 U.S. 333, 342 (2006)("[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supercede the trial court's credibility determination."); Hernandez v. New York, 500 U.S. 352, 369 (1991)("where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.");[12] Bond v. Beard, 539 F.3d 256, 272 (3rd Cir. 2008)(noting that reasonable minds could differ regarding the trial court's determination that purposeful discrimination was not proven but denying habeas claim given AEDPA's deferential standard).  Petitioner has not carried his burden of producing clear and convincing evidence that the trial and appellate court's determination that Petitioner had not established that a comparative juror analysis supported a conclusion that the prosecutor's race-neutral reasons were pretextual

_____

[11] Interestingly, despite his criticism of the state appellate court's failure to conduct an in-depth analysis, Petitioner's own analysis is sparse – he provides few side-by-side comparisons and in some instances merely references "other white jurors."  Although Petitioner asserts in a footnote in his habeas petition that he would provide the Court with an exhibit containing a comprehensive analysis of the questioning of prospective black jurors as compared to the questioning of prospective white jurors, (Mem. Supp. Pet. Writ. Habeas Corpus 6 n.2.), such analysis was never provided.

[12] Hernandez v. New York, 500 U.S. 352 (1991), was the direct appellate review of the New York Court of Appeals rejection of a defendant's Batson claim.  The respect owed to state court findings in the habeas context is even greater than the deference owed them in a direct criminal appeal.  28 U.S.C. § 2254(e)(1).

Case 3:05-cv-00346-GCM   Document 29   Filed 02/25/09   Page 19 of 47

was erroneous. As such, Petitioner has not carried his burden in establishing that the appellate court's conclusion on this basis was an unreasonable determination of the facts in light of the evidence produced in the state court proceedings and this claim is dismissed. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

### 4. Unreasonable Application of Miller-El: Strength of Prima Facie Case

Petitioner also argues that the state courts unreasonably applied Miller-El when it "never considered the strength of petitioner's prima facie case in their analysis of this issue." (Memo. Supp. Pet. Writ Habeas Corpus 10.) Petitioner does not further explain this assertion and a review of the record finds no support for it. Petitioner's prima facie case for a Batson violation was primarily based upon statistics. (Trial Tr. 10/30/2000, 564-69, 759-60, 871.) Without question the appellate court considered the statistical disparity set forth in the prima facie case when conducting its ultimate analysis under the third prong of Batson. See infra. In analyzing Petitioner's Batson claims, the appellate court noted that the statistical disparity existed but that no other factors supported a conclusion that the peremptory challenges had been used in a discriminatory manner. See Wiggins 159 N.C. App. at 264, 265, 267. Petitioner's claim is meritless.

### 5. Unreasonable Application of Miller-El: Race-Neutral

Petitioner also argues that the state courts unreasonably applied Miller-El 537 U.S. 322 (2003) and Miller-El, 545 U.S. 231 (2005) ("Miller-El II"), because "in assessing the validity of the race-neutral explanations proffered by the prosecutors, the trial court did not consider the strength of defendant's prima facie case of discrimination, as required by Miller-El. He did not

20

engage in any analysis of the reasons proffered, or compare the answers of accepted white jurors on the topics that the prosecutors claimed to have focused on, or compare the questioning of the black jurors with the questioning of white jurors. The trial judge instead simply accepted the reasons proffered by the prosecutors at face value." (Memo. Supp. Pet. Writ Habeas Corpus 11.)

Petitioner misapprehends the requirements of the second prong of the Batson test. After defense counsel has established a prima facie case of discrimination, the prosecutor must present a facially valid, race-neutral reason for his use of a peremptory challenge. The prosecutor's explanation need not be persuasive; it must only be based on some factor other than the juror's race. See Hernandez v. New York, 500 U.S. 352, 360 (1991); see also Purkett v. Elem, 514 U.S. 765, 767-68 (1995)("[t]he second step of this process does not demand an explanation that is persuasive or even plausible"). Even if the prosecutor's reasons are frivolous or nonsensical, the analysis does not end, it merely proceeds to the third step. See Johnson v. California, 545 U.S. 162, 171 (2005). It is only then that a trial court evaluates whether the defendant has established purposeful discrimination. Id. It is when analyzing this third prong that comparative juror analysis becomes relevant. See Hernandez, 500 U.S. at 365. The trial court's application of the second prong of Batson did not violate clearly established federal law. Consequently, the state appellate court's upholding of the trial court with regard to the Batson issue was not an unreasonable application of Supreme Court precedent and Petitioner's claim on this basis fails.

### 6. Unreasonable Application of Batson: Gender Discrimination

Petitioner also argues that the state courts unreasonably applied Batson and its progeny because the "trial court did not make an independent assessment of the gender-based exclusions. The state appellate court merely deferred to the trial court's determination." (Memo. Supp. Pet.

Writ Habeas Corpus 9.)  Petitioner does not further explain this statement.

At the Batson hearing both race and race-gender discrimination were addressed.  (See e.g., Memo. Supp. Mot. Summ. J., Ex. 5: Batson Hearing Tr. 135, 143-44, 148, 149, 152, 161.) In ruling that Petitioner failed to establish purposeful discrimination, the trial court specifically referenced gender numerous times.  (See e.g., Memo. Supp. Mot. Summ. J., Ex. 6,  ¶¶ 4, 5, 6, 10.)  Admittedly the trial court's order interwove the race and race-gender arguments.  Such an analysis while not incorrect also reflected the interwoven manner in which the arguments were presented to the trial court.  The issue of discrimination based upon both race and gender were argued at the Batson hearing and specifically ruled upon by the trial court.

Likewise, the state court of appeals opinion reflects that the appellate court independently considered and rejected Petitioner's gender and race-gender Batson claims.  Wiggins, 159 N.C. App. at 266-67.  Indeed, the opinion contains a separate heading referring to race-gender (and just gender) discrimination.  Id.  Given that a "state court need not make detailed findings addressing all the evidence before it," the appellate court's opinion was more than an adequate analysis of the gender and gender-race claim.  See Miller-El, 537 U.S. at 347; see also Moseley v. Brankon, 550 F.3d 312, 319 (4th Cir. 2008)(when reviewing the reasonableness of a state court's application of Supreme Court precedent, a federal habeas court reviews "the result that the state court reached, not whether its decision was well reasoned.")(citation omitted);  Smulls v. Roper, 535 F.3d 853, 860-61 (8th Cir. 2008)(absence of detailed findings when ruling on a Batson claim is not a misapplication of clearly established Supreme Court precedent), pet. cert. filed, No.08-7465 (U.S. Nov. 26, 2008).  Consequently, Petitioner's claim on this basis fails.

**7. Summary**

In summary, the appellate court's <u>Batson</u> ruling affirming the trial court's finding of no discrimination did not involve an unreasonable application of clearly established Supreme Court precedent. Nor was it based on an unreasonable determination of the facts in light of the evidence presented to the state courts.

## C. <u>CHAPMAN CLAIM</u>

### 1. <u>Cumulative Impact of Inadmissable Evidence</u>

In his second claim in his federal habeas petition, Petitioner argues that the North Carolina courts unreasonably applied the harmless error rule of <u>Chapman v. California</u>, 386 U.S. 18 (1967). (Mem. Supp. Pet. Writ Habeas Corpus 12-30.) More specifically, Petitioner contends that the MAR court did not consider the cumulative impact of the three erroneously admitted pieces of evidence because it considered the court of appeals ruling to be the law of the case. (Mem. Supp. Pet. Writ Habeas Corpus 15.) Petitioner argues that because the court of appeals specifically relied upon the two statements to Officer Grant[13] when determining that the admission of the hospital notes was harmless, no state court assessed "the cumulative impact of these errors." (Mem. Supp. Pet. Writ Habeas Corpus 15.)

On direct appeal the North Carolina Court of Appeals found that the handwritten notes of Cherica Adams ("Adams") were erroneously admitted into evidence. <u>State v. Wiggins</u>, 159 N.C. App. 252, 257-58, <u>disc. review denied</u>, 357 N.C. 511 (2003), <u>cert. denied</u>, 541 U.S. 910, <u>reh'g</u>

---

[13] The court of appeals opinion did rely upon the testimony of Officer Grant in ruling that the admission of the hospital notes was harmless error. <u>Wiggins</u>, 159 N.C. App. at 258-59. However, the appellate court relied equally as heavily on other evidence such as the testimony of Kennedy and Smith and the 911 call transcript in making its determination. <u>Id.</u>

Case 3:05-cv-00346-GCM   Document 29   Filed 02/25/09   Page 23 of 47

denied, 541 U.S. 1038 (2004). The court of appeals went on, however, to hold that the admission

of these notes was harmless beyond a reasonable doubt. Id. at 258-59. Significantly, on the day

Petitioner's certiorari petition to the Supreme Court was denied, the Supreme Court issued its

opinion in Crawford v. Washington, 541 U.S. 36 (2004), in which the Supreme Court held that

the right to confrontation bars the "admission of testimonial statements of a witness who did not

appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity

for cross-examination." Id. at 53- 54.

In reaction to the Supreme Court's holding in Crawford, Petitioner filed an MAR

challenging, among other things, the admission of Adams' statements to Officer Grant at the

scene of the shooting and at the hospital. (Memo. Supp. Mot. Summ. J., Ex. 12.) After an

evidentiary hearing, the MAR court issued an order finding that the admission of the statements

by Adams to Officer Grant violated the Confrontation Clause but that such error was harmless

beyond a reasonable doubt. State v. Wiggins, 2005 WL 857109, at * 3-4 (N.C. Sup. Ct. Mar. 18,

2005). In its order, the MAR court noted that the appellate court had concluded that Adams'

handwritten notes were erroneously admitted but that such admission was harmless beyond a

reasonable doubt and that such ruling was the law of the case. Id. at * 1. The MAR court also

noted that Petitioner acknowledged at that time that the North Carolina Court of Appeals ruling

was not a contested issue. Id.

No one disputes that the admission of these two statements was erroneous. Therefore the

MAR court's determination that the Confrontation Clause error was harmless is the merit

determination at issue. Because the state court adjudicated this claim on the merits, in order to

prevail on federal habeas review, Petitioner must establish that the state court's ruling resulted in

24

a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

The clearly established Supreme Court precedent at issue is Chapman v. California, 386 U.S. 18 (1967). In Chapman, the Supreme Court held that a constitutional error can be harmless if it is established beyond a reasonable doubt that the error did not contribute to the verdict. Id. at 24. The Supreme Court has repeatedly affirmed the principle that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). The Chapman harmless error analysis extends to Confrontation Clause violations. See id. at 684.

Petitioner argues that the state courts' harmless error analysis was flawed because neither the court of appeals nor the MAR court assessed the cumulative impact of the three errors. (Mem. Supp. Pet. Writ Habeas Corpus 15.) Petitioner asserts that "this flawed harmless error review constitutes an unreasonable application of Chapman v. California, 386 U.S. 18 (1967)." (Mem. Supp. Pet. Writ Habeas Corpus 15.)

As an initial matter, the Court notes that the MAR court clearly did not include the substance of the handwritten notes when conducting its harmless error analysis with regard to the erroneous admission of Adams' statements to Officer Grant. First, the MAR court acknowledged the court of appeals exclusion of the notes. Second, in determining that the erroneous admission of the statements to Officer Grant constituted harmless error, there is no indication that the MAR

25

court considered the substance of the notes in finding that the error was harmless. The MAR court did not reference the notes when specifically referring to evidence, such as the testimony of specific witnesses, to support its conclusion. Even more significantly, the MAR court specifically referenced that in making its ruling that it had considered "properly admitted evidence by the State at trial." State v. Wiggins, 2005 WL 857109, at * 4 (N.C. Sup. Ct. Mar. 18, 2005). Given the MAR court's acknowledgment of the court of appeals ruling that the notes were erroneously admitted coupled with its reference to "properly admitted evidence," it is highly improbable that the MAR court considered the content of the notes when determining that the admission of the statements was harmless error.

Petitioner, however, argues that the MAR court did not consider the cumulative harm of allowing all three subsequently deemed inadmissable pieces of evidence in at trial. (Mem. Supp. Pet. Writ Habeas Corpus 15, 24-26.) Petitioner supports this assertion solely by pointing to the MAR court's acknowledgment in its order that the law of the case[14] dictated that the admission of the handwritten notes was harmless beyond a reasonable doubt. (Mem. Supp. Pet. Writ Habeas Corpus 26.)

Notwithstanding Petitioner's assertion to the contrary, this statement alone does not lead to the inevitable conclusion that the MAR court did not consider the cumulative impact of the improper admission of these three pieces of evidence. Indeed, the reference on its face merely

---

[14] The MAR court stated in its order that "[t]he North Carolina Court of Appeals has already ruled upon this error, conducted such analysis and found the error to be harmless beyond a reasonable doubt. . . . [a]s such, this ruling amounts to the 'law of the case' and is not subject to further review by this Court." State v. Wiggins, Nos. 99CRS100006, 99CRS46567, 99CRS46569, 99CRS50145, 2005 WL 857109, *1 (N.C. Super. Mar. 18, 2005). The MAR court also noted with regard to the hospital notes of Adams that "Defendant acknowledges in his reply brief that this is not a contested issue on this Motion for Appropriate Relief . . . ." Id.

Case 3:05-cv-00346-GCM   Document 29   Filed 02/25/09   Page 26 of 47

indicates that the MAR court could not revisit the particular issue of the finding by the appellate court that the admission of the hospital notes was by itself harmless error. Such an assertion does not automatically indicate that the MAR court did not consider the impact of the erroneous admission of all three pieces of evidence.

The portion of the MAR court's order ruling that the admission of Adams' oral statements to Officer Grant into evidence was harmless is summary in nature. However, the record indicates that Petitioner presented his cumulative prejudice argument to the MAR court in his filings and at the hearing. (Memo. Supp. Mot. Summ. J. Ex. 12, 10, 13-14; MAR Hearing Tr. 3/10/2005 92, 130-34.) As such, a conclusion that the MAR court considered and rejected this line of reasoning is reasonable.

Moreover, by ruling that the admission into evidence of the oral statements to Officer Grant was harmless error, the MAR court necessarily, logically applied the harmless error analysis to all three pieces of evidence at once. The MAR court ruled that Adams' statements to Officer Grant were cumulative with properly admitted evidence. The appellate court had ruled that the handwritten notes were cumulative with at least three pieces of evidence – one of which was the subsequently determined improperly admitted statements. However, as the statements were redundant, the MAR court was reaffirming the appellate court's harmless error determination but with regard to all the evidence.

Petitioner has the burden of establishing a habeas claim. Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). Petitioner's present claim is based on conjecture which is insufficient to carry his burden.

**2. Petitioner Is Not Entitled to Relief Under the Brecht Harmless Error Standard**

Even if this Court concluded that the MAR court unreasonably applied the Chapman standard, this Court must review Petitioner's claim de novo. Jones v. Polk, 401 F.3d 257, 265 (4th Cir. 2005). As part of this process, this Court cannot grant Petitioner's writ of habeas corpus if the error was harmless. Id. The harmless error standard applicable in habeas proceedings is the more stringent standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007)(holding that the Brecht-O'Neal standard applies in all § 2254 cases, even post-AEDPA ones).

Under this standard, a habeas petitioner is entitled to relief only if a habeas court is "in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "'Grave doubt' exists when, in light of the entire record, the matter is so evenly balanced that the court feels itself in a 'virtual equipoise' regarding the error's harmlessness." Richmond v. Polk, 375 F.3d 309, 335 (4th Cir. 2004). The proper inquiry is not "merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." Kotteakos v. United States, 328 U.S. 750, 765 (1946). In analyzing whether an error is harmless under this standard a habeas court must look to "the impact of the thing done wrong . . . in the total setting." Id. at 764. The Supreme Court has reasoned that granting habeas relief to a petitioner merely because there may be a "reasonable probability" that a trial error contributed to the verdict would be contrary to the historic purpose of habeas corpus - "to afford relief [only] to those whom society has 'grievously wronged.'" Brecht, 507 U.S. at 637.

In assessing whether an error was harmless, the <u>Brecht</u> court considered the prominence of the constitutional error, whether the improperly admitted evidence was cumulative, and the strength of the prosecution's other evidence. <u>Brecht</u> 507 U.S. at 639.

When applying the <u>Brecht</u> standard, the substantive content of the erroneously admitted evidence is highly relevant. The testimony of Officer Grant places Petitioner at the scene of the incident and it also sets forth that Petitioner stopped[15] in the middle of the road immediately before the shooting for apparently no reason. (Trial Tr. 11/22/00 –11/30/00  196-97, 200-01.) In addition, Officer Grant testified that Adams told him that Petitioner had shot her.[16] (Trial Tr. 11/22/00-11/30/00 196, 200.)  With regard to the handwritten note of Adams, Traci Willard ("Willard"), the nurse, testified  that Adams wrote that Petitioner stopped on Rae Road for no reason. (Trial Tr. 11/20/00-11/21/00 197.)  She further testified that Adams stated that Petitioner never came back. (Trial Tr. 11/20/00-11/21/00 197.)   In addition, Willard testified that Adams wrote that Petitioner insisted on coming back to her place after the movie and that he called Hannibal Navies before they left his house and said that they were leaving.  (Trial Tr. 11/20/00-11/21/00 199, 220, 228-29).

Almost all of the above testimony is redundant with other evidence. For instance, during the 911 call[17] Adams stated that she was following Petitioner and that he slowed in front of her

---

[15]  The Court notes that during his cross-examination of Officer Grant, defense counsel elicited the fact that Officer Grant's notes of the conversations stated that Adams told him that Petitioner slowed down (rather than stopped). (Trial Tr. 11/22/00-11/30/00,  232-38.)

[16]  Neither side at trial advanced the theory that Petitioner actually shot Adams.

[17]  As discussed <u>infra</u>, this Court holds that the MAR court reasonably applied <u>Crawford</u> in ruling that the 911 call was not testimonial and was therefore admissible.

and a car pulled up beside her and someone in the car shot her. (Memo. Supp. Mot. Summ. J. Ex. 4, 107, 108 .) Adams also told the medic that Petitioner called someone before they left his house. (Memo. Supp. Mot. Summ. J. Ex. 4, 107.) Adams further stated during the 911 call that after Petitioner slowed down and she was shot Petitioner just left. (Memo. Supp. Mot. Summ. J. Ex. 4, 108 .) Adams also provided the medic with a description of the car Petitioner was driving and the address of where he lived. (Memo. Supp. Mot. Summ. J. Ex. 4, 110, 111.) Adams' roommate also testified that Adams had called him after the movie and indicated that she and Petitioner were unexpectedly coming over to her apartment. (Trial Tr. 11/20/00-11/21/00, 317.) Kennedy testified that he received a telephone call from Petitioner around midnight. (Trial Tr. 11/22/00-11/30/00, 52.) Hannibal Navies testified that Petitioner called him that evening to tell him that he was coming over to his house. (Trial Tr. 12/11/00-12/15/00, 412.)

As evidenced above, a review of the record leads to the conclusion that the substance of the 911 call overlapped significantly with the content of Adams' two conversations with Officer Grant and with the content of her handwritten notes. Moreover, the source of much of the redundant information is the same – Cherica Adams. In fact, the 911 call is arguably more powerful evidence because the jury heard Adams herself say the information unfiltered by someone else's recollection. Indeed, at the MAR hearing Petitioner's counsel brought to the court's attention the fact that the foreperson of Petitioner's jury had stated in a television interview that the jury "always kept going back to that 911 call; and then we would go to the notes she wrote in the hospital." (MAR Hearing Tr. 3/10/2005, 12.)

The only major difference appears to be that Willard and Officer Grant testified that Adams said/wrote that Petitioner stopped on Rae Road immediately before the shooting for no

reason as opposed to her statement during the 911 call that Petitioner slowed down. (Trial Tr. 11/22/00-11/30/00 196-97, 200-01.) As previously noted, Officer Grant was aggressively cross-examined on his testimony that Petitioner inexplicably stopped given that his notes after the conversation indicated that Adams said Petitioner slowed down. (Trial Tr. 11/22/00-11/30/00 232-38.) In addition, the jury heard, through the 911 call, Adams, in her own words, state that Petitioner slowed down. Adams' father testified that at the hospital he asked Adams "if there were any stop lights or stop signs in the road as a reason for his vehicle stopping in front of her," and that she "shook her head no." (Trial Tr. 11/20/2000-11/21/2000 372-73.) In any event, this Court does not find the distinction between slowed down and stopped to be critical in this analysis. The 911 call unequivocally places Petitioner at the scene of the shooting and establishes that Petitioner inexplicably fled immediately after the shooting and Hannibal Navies' testimony establishes that shortly after the shooting occurred Petitioner arrived at a friends house and proceeded to call another girlfriend and to watch television and play video games. (Trial Tr. 12/11/00-12/15/00 412-17.)

The Court also notes that significant additional evidence aside from the statements to Officer Grant and the handwritten notes was presented at trial. Two of his co-conspirators - - Watkins and Kennedy – provided testimony that set forth Petitioner's involvement in the planning and execution of the shooting. (Trial Tr. 11/20/00-11/21/00, 415-22; 11/22/00-11/30/00 2-193; 12/20/00-12/22/00 148-49, 159-217.) Phone records were introduced that were consistent with testimony from Kennedy and Watkins. In addition, the prosecution introduced testimony from two former girlfriends relating to Petitioner's extremely negative and threatening

Case 3:05-cv-00346-GCM   Document 29   Filed 02/25/09   Page 31 of 47

reactions to their pregnancies. (Trial Tr. 1/2/01, 357-76, 386-92, 411-26, 492-516.)[18] In addition, another girlfriend testified as to Petitioner's negative comments about Adams and his stated wish at the hospital that Adams would die and his admission to her to being involved in the shooting. (Trial Tr. 11/22/00-11/30/00, 313, 317-18.) Hannibal Navies, a teammate of Petitioner's, testified that Petitioner called him at 12:15 a.m. of the night in question and stated he was coming over and that Petitioner arrived at his house around 12:45 a.m. (Trial Tr. 12/11/00-12/15/00, 395, 411.) Adams' roommate also testified that Adams had called him after the movie and indicated that she and Petitioner were coming over to her apartment. (Trial Tr. 11/20/00-11/22/00, 317.) A pathologist testified that Petitioner's car must have been static with the shooting car based upon the wounds inflicted. (Trial Tr. 12/4/00, 771-72; MAR Hearing Tr. 3/10/2005, 116.) Upon learning of Adams' death, Petitioner, who was under a court order not to leave town, fled the state and was eventually captured at a motel in Tennessee. (Trial Tr. 12/4/00, 606-22.)

Petitioner spends a good deal of time discussing credibility issues with regard to the above evidence. Given the overlapping nature of the content of the 911 call and the erroneously admitted evidence, such analysis is not persuasive. The jury heard the cross-examination and contradictions highlighted by Petitioner and still found Petitioner guilty. Likewise, Judge Lamm, who ruled on the MAR and was the trial judge, also directly observed and heard the testimony. Deleting primarily cumulative evidence does not diminish the State's case.

---

[18] A letter written by Petitioner and sent to Amber Turner was read to the jury and admitted into evidence. In the letter Petitioner implores Turner to characterize his relationship with his son and her mother in a certain light. (Trial Tr. 1/2/01 416-26.) Turner testified that for the most part the requested characterization was not accurate. Id.

32

In conclusion, the evidence that was erroneously admitted – the statements to Officer Grant and Adams' handwritten notes –  was in all important aspects cumulative with other admissible evidence – most notably Adams' 911 call.  Moreover, the prosecution offered numerous witnesses that corroborated crucial details.  Floyd, Kennedy, Watkins, and Smith, at a minimum, corroborated Petitioner's presence at the shooting, his slowing down, and his fleeing of the scene.  Defense counsel conducted extensive cross-examination of the erroneously admitted testimony of Officer Grant and Willard.  (Trial Tr. 11/22/00-11/30/00, 207-40, 243; 11/20/00-11/21/00,  237-62, 266.)  Finally, a review of the entire record, as set forth in Respondent's Motion for Summary Judgment and above, shows that the overall strength of the prosecution's case was substantial.  Consequently, this Court holds that the erroneous admission of the three pieces of evidence at issue constituted harmless error under <u>Brecht</u>.

In advancing his argument that the admission of the evidence at issue was not harmless error, Petitioner also focuses on the emphasis that the prosecution placed on the statements to Officer Grant and the handwritten notes and the need for an Allen charge and the resulting split verdict.  Admittedly, these facts give this Court pause.  However, based upon the above analysis, this Court cannot conclude that the erroneous admission of the three pieces of evidence leaves this Court in grave doubt about whether their admission had a substantial and injurious effect or influence in determining the jury's verdict.  That is, weighing the cumulative effect of the admission of these three pieces of evidence against the weight of the record as a whole does not cause this Court to conclude that a grave injustice was committed.

**D.  CRAWFORD CLAIM**

In his third claim, Petitioner argues that the state post-conviction court unreasonably applied the Supreme Court's holding in Crawford v. Washington, 541 U.S. 36 (2004), when it ruled that the admission of portions of the 911 call did not violate the Confrontation Clause. Specifically, Petitioner challenges the admission of the portion of Adams' 911 call where Adams stated that she had been following Petitioner and a car pulled up beside her and shot at her. (Mem. Supp. Pet. Writ Habeas Corpus 30-33.)  In addition, in his Response to the Motion for Summary Judgment, Petitioner specifically challenges the admission of the portion of the 911 call pertaining to a description of Petitioner's car.  (Pet'r's Resp. Mot. Summ. J. 52.)

Petitioner raised this Crawford claim in his MAR where it was denied.  In denying this claim, the MAR court made the following findings of fact:

1. The 911 call was initiated by the victim, Cherica Adams, in an attempt to obtain medical assistance; not generated by police operating with the desire to seek evidence against a suspect.

2. The questions posed in the 911 call, in addition to locating and rendering medical assistance to the victim as soon as possible, were not seeking to gain information for further prosecution but instead were motivated by a desire to assess the situation at the scene and whether or not the perpetrator was still on or near the scene (or was likely to return and if so, from what direction and in what manner of transportation), for the added purpose of the safety and security of responding medical personnel and police as well as protecting the victim from further danger and injury.

3. At the time of and during the entirety of the 911 call, Cherica Adams (8 months

34

pregnant) was struggling for survival of herself and her unborn child. The call occurred only moments after a brutal assault with multiple gunshot wounds resulting in uncontrolled bleeding and severe internal injuries. She was unsure of her location and trying desperately to direct medical help toward her location. Given these circumstances, her statements and responses simply do not qualify as responses to structured questioning in an investigative environment in which the declarant reasonably expects that they will later be used in a criminal prosecution.

4. Instead, these statements and responses are essentially a cry for help, a part of the criminal incident itself rather than a part of a prosecution that follows as a result of the commission of the crimes.

5. Charlotte/Mecklenburg 911 operators, although employed by the Charlotte/Mecklenburg Police department, are not trained that part of their job is to investigate and solve crimes or that their purpose is to gather information for further use in a criminal prosecution; instead, their training focuses on gaining information on the location of the caller and if injury is involved, determining its seriousness and how it occurred to determine whether to get a Medic operator on the line. Questions regarding description of the perpetrator(s), vehicle(s), direction of travel, etc. are designed to gain information for securing the scene for medical personnel and insuring the safety of all (medical and police) dispatched to the scene.

6. Medic is neither connected in any manner with nor under the control of the Charlotte/Mecklenburg Police Department. Their training and certification is based upon a different, national standard and they receive no joint training with 911 operators.

The MAR court also made the following conclusions of law:

1. Given the circumstances surrounding the 911 call and the unstructured manner in

35

which the questions asked both by the 911 operator and the medic operator "jumped" back and forth between various subjects, the information obtained was not the result of structured questioning during the course of police interrogation even when such term is used in the colloquial sense.

2. The statements and answers of Cherica Adams made in the 911 call, including those specifically objected to in this motion, are non-testimonial and their admission into evidence at defendant's trial did not violate his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

Because the state court adjudicated this claim on the merits, in order to prevail on federal habeas review, Petitioner must establish that the state court's ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Moreover, this Court presumes the state court's factual findings are correct. 28 U.S.C. § 2254(e)(1). Petitioner may overcome this presumption by establishing by clear and convincing evidence that the factual findings are incorrect. 28 U.S.C. § 2254(e)(1).

As noted above, the MAR court made detailed findings of fact. While Petitioner does not specifically state that he is challenging the findings of fact,[19] his argument is based on findings of fact contrary to those found by the MAR court. More specifically, using the transcript of the 911

---

[19] Petitioner does not cite to 28 U.S.C. § 2254(e)(1). Nor does he acknowledge the burden he carries to overcome the findings of fact. Indeed, although Petitioner explicitly asserts that the MAR court unreasonably applied the law, (Mem. Supp. Pet. Writ Habeas Corpus 30; Pet'r's Resp. Mot. Summ. J. 46 54), he never explicitly asserts that he is challenging the correctness of the facts.

call itself, Petitioner argues that portions of the questioning were structured, done in a non-emergency context, and designed to elicit information to help investigate a possible crime. (Pet'r's Resp. Mot. Summ. J. 49-53.)

Even assuming that Petitioner's interpretation of the 911 call is reasonable, this Court cannot say that it was objectively unreasonable for the MAR court to make the findings of fact set forth in the MAR Order. For example, while Petitioner concludes that questions concerning the identity of the suspect, his vehicle description, and the direction he was heading were purely investigatory, the MAR court concluded that such questions were motivated by "a desire to assess the situation at the scene and whether or not the perpetrator was still on or near the scene (or was likely to return and if so, from what direction and in what manner of transportation), for the added purpose of the safety and security of responding medical personnel and police as well as protecting the victim from further danger and injury." State v. Wiggins, No. 99CRS100006, 99CRS46567, 99CRS46569, 99CRS50145, 2005 WL 857109 * 2 (N.C. Sup. Mar. 18, 2005). The MAR court's findings of fact are not unreasonable. The fact that reasonable minds can differ is not sufficient on habeas review to overcome the presumption of correctness granted to state court findings of fact. Rice v. Collins, 546 U.S. 333, 342 (2006). Petitioner fails to uphold his burden of establishing by clear and convincing evidence that the state court findings of fact are incorrect.

Nor does Petitioner establish that the MAR court unreasonably applied clearly established Supreme Court precedent - namely Crawford v. Washington, 541 U.S. 36 (2004). In Crawford the Supreme Court held that the right to confrontation bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the

defendant has had a prior opportunity for cross-examination." Id. at 53-54. Petitioner argues that the MAR court in his case unreasonably applied Crawford when it ruled that portions of the 911 statements made by Adams were admissible. To establish an unreasonable application Petitioner must demonstrate that the MAR court applied the correct rule to specific facts in an objectively unreasonable way. See Williams v. Taylor, 529 U.S. 362, 409 (2000).

In Crawford the Supreme Court held that the admission of a tape-recorded out-of-court statement to police officers at the police station by the defendant's wife violated the Confrontation Clause. Crawford, 541 U.S. at 68. In so holding, the Supreme Court rejected the notion that the admission of an out-of-court statement by a non-testifying witness does not violate the Confrontation Clause if a sufficient indicia of reliability of the statement exists. Id. at 61. The Supreme Court concluded that the right to confrontation bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Id. at 53-54. As such, once an out-of-court statement is determined to be testimonial it may not be admitted into evidence unless the defendant had an opportunity to cross-examine the witness. Id.

In announcing the rule in Crawford, the Supreme Court stated that it "left for another day any effort to spell out a comprehensive definition of 'testimonial.'" Id. at 68. The majority acknowledged that "our refusal to articulate a comprehensive definition in this case will cause interim uncertainty." Id. at 68 n.10. As such, the rule applied by the MAR court, as set out in Crawford, was very general. The Crawford court did not provide more guidance on the definition of testimonial because the case before it involved a situation where the statement at issue qualified under any conceivable definition of "interrogation." Crawford, 541 U.S. at 53

n.4.  The Supreme Court has noted in the federal habeas context that "the more general the rule, the more leeway courts have in reaching [reasonable] outcomes in case-by-case determinations." Yarborough v. Alvarado,  541 U.S. 652, 664 (2004).

Petitioner simply does not establish how the MAR court's opinion was objectively unreasonable in light of Crawford.  Indeed, after the Crawford decision, numerous federal and state courts ruled that 911 calls were not testimonial.  See e.g., United States v. Hinton, 423 F.3d 355 (3rd Cir. 2005) (911 statement was nontestimonial); United States v. Brun, 416 F.3d 703, 707 (8th Cir. 2005) (same); Leavitt v. Arave, 383 F.3d 809, 830 n.22 (9th Cir. 2004) (same); Pitts v. State, 272 Ga. App. 182, 187 (2005)(same), aff'd, 280 Ga. 288 (2006).  Petitioner's reliance upon three state court cases holding that 911 calls were or could be testimonial are insufficient to carry his burden.[20]  Given that numerous federal appellate courts that have addressed the admissibility of 911 statements found such statements to be non-testimonial and therefore admissible, and the fact that state courts differed in reasoned opinions, the MAR court's opinion at issue in this case cannot be viewed as objectively unreasonable.

In his response to the Motion for Summary Judgment, Petitioner vociferously argues that the Supreme Court's holding in Davis v. Washington, a 2006 Confrontation Clause case, provides further guidance on whether statements made by a victim in a 911 call are testimonial. (Pet'r's Resp. Mot. Summ. J. 46-54.)

Indisputably, as Davis was filed after this federal habeas petition was filed, it was not

---

[20]  See e.g., People v. Cortes, 781 N.Y.S. 2d 401 (N.Y. Sup. Ct. 2004) (911 statements were testimonial); State v. Powers, 99 P.3d 1262 (Wash. App. 2004) (same); State v. Davis, 2005 WL 1115865 (Wash. May 12, 2005) (911 calls should be assessed on case-by-case basis for admissibility).

39

clearly established Supreme Court precedent at the time of Petitioner's state collateral

proceedings. Consequently, this Court finds the argument that the Davis opinion can be used to

establish the unreasonableness of a state court decision that predates it specious at best. Later

Supreme Court cases "play no role in assessing the reasonableness of the state court decisions."

Brown v. Greiner, 409 F.3d 523, 533-34 (2d Cir. 2005); see Williams v. Taylor, 529 U.S. 362,

390 (2000)("clearly established at the time his state court conviction became final."); cf.

Yarborough v. Alvarado, 541 U.S. 652, 660-61 (2004)(referring to Supreme Court holdings "as

of the time of the relevant state-court decision").[21]  As such, the Davis case cannot be used to

provide support for Petitioner's argument that the MAR court unreasonably applied Chapman.

This is particularly true where, as here, the Supreme Court precedent is admittedly general in

nature and the subsequent precedent is much more specific.

Moreover, even if Davis could be used to determine the reasonableness of the MAR

court's ruling regarding the admission of the 911 tape, it would have no impact on this Court's

conclusion that the MAR court did not unreasonably apply Crawford.  In Davis v. Washington,

547 U.S. 813 (2006), the Supreme Court refined the meaning of "testimonial" in a pair of cases

involving police interrogation.  Id. at 826.  In the Davis case[22] the Court considered whether

statements made by a victim to a 911 operator were testimonial.  After reviewing the record, the

Court concluded that the statements to the 911 operator were nontestimonial.  Id. at 828.  In

---

[21]  Whether a habeas court must look at the Supreme Court precedent at the time a
petitioner's state-court conviction became final or at the time of the relevant state-court decision
has no impact in the instant case.

[22] In the companion case,  Hammon,  the Court considered whether statements made to
police officers at the scene of a domestic disturbance were testimonial.

reaching this conclusion, the Court distinguished <u>Crawford</u> by noting that in <u>Davis</u> the statements concerned events in the present; the statements were given during an ongoing emergency; the questions were asked to resolve a present emergency; and the context of the questioning was informal and frantic. <u>Id.</u> at 827. A review of the MAR court's opinion reveals that even without the benefit of the <u>Davis</u> case, the MAR court focused on many of the same factors identified by the Supreme Court to be relevant to a determination of whether a statement is testimonial. The findings of fact made by the MAR court such as the existence of an ongoing emergency, the nonstructured nature of the questioning, and that the questions were designed to gain information for securing the scene and insuring the safety of all fall squarely into the Supreme Court's definition of testimonial.[23] As such, even if <u>Davis</u> were established Supreme Court precedent, the MAR court's opinion was not an unreasonable application of <u>Davis</u>.

      Finally, in arguing so vociferously that the present case is distinguishable from <u>Davis</u>, Petitioner appears to forget that he must prove more than that the MAR court was incorrect. In <u>Williams v. Taylor</u> the Supreme Court emphasized that "unreasonable" is not the same as "incorrect." <u>See</u> <u>Williams</u> 529 U.S. at 411. It is simply not enough to establish that Petitioner's case could be reasonably decided differently. Petitioner must establish that the MAR court's decision was objectively unreasonable. For the reasons set forth above, this Petitioner does not do so.

---

[23] Facts found by an MAR court are presumed correct and if contested by a petitioner they must be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Petitioner does not carry this burden.

**E.  BLAKELY CLAIM**

For his fourth claim Petitioner argues that the MAR Court's ruling that the holding in

Blakely did not apply to Petitioner's case is an unreasonable application of Blakely v.

Washington, 542 U.S. 296 (2004), Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New

Jersey, 530 U.S. 466 (2000).  (Mem. Supp. Pet. Writ Habeas Corpus 33- 39.)

In his Petition, Petitioner states that he received the maximum aggravated sentence on

both the conspiracy conviction and on the discharging the firearm conviction, based on the

sentencing court finding by a preponderance of the evidence two aggravating factors: 1)

Petitioner "occupied a position of leadership or dominance of other participants in the

commission of the offense," and 2) Petitioner "took advantage of a position of trust or confidence

to commit the offense."  (Mem. Supp. Pet. Writ Habeas Corpus 33-34.)  The sentencing judge

then ran these aggravated sentences consecutively resulting in a sentence that was far in excess of

the statutory limit applicable without these judicial findings.  Based upon the above, Petitioner

contends that his sentence violated the Supreme Court's rulings in Apprendi, Ring, and Blakely.

(Mem. Supp. Pet. Writ Habeas Corpus 34-35.)

Petitioner presented this Blakely issue in his MAR which was filed in the Mecklenburg

Superior Court on December 2, 2004.  In denying Petitioner's MAR, the state court held that the

Supreme Court's ruling in Blakely was not retroactive and therefore had no application to

Petitioner's case.  State v. Wiggins, 2005 WL 857109 * 4 (N.C. Super. Mar. 18, 2005), cert. pet.

den., (N.C. Ct. App. Jul. 6, 2005).[24]  Because the state court adjudicated this claim on the merits,

---

[24]  Because the denial of the certiorari petition was summary in nature, this Court will
look to the MAR opinion.  See Ylst v. Nunnemaker, 501 U.S. 797, 801-03 (1991); accord
Skipper v. French, 130 F.3d 603, 609 (4th Cir. 1997).

in order to prevail on federal habeas review, Petitioner must establish that the state court's ruling resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent or that resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

Petitioner's case became final on direct review when the Supreme Court of the United States denied Petitioner's Petition for Writ of Certiorari on March 8, 2004.  <u>Blakely</u> was decided on June 24, 2004.  Consequently, the holding in <u>Blakely</u> does not apply to Petitioner's case if it is a new rule of law unless it is determined to be a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.  See <u>United States v. Morris</u>, 429 F.3d 65, 69 (4th Cir. 2005)(discussing when cases decided after a criminal case have become final on direct review may be applied retroactively).

Petitioner first argues that the rule announced in <u>Blakely</u> is not "new."  Petitioner argues that the holding in <u>Blakely</u> is merely an extension of the Supreme Court's holding in <u>Apprendi</u> and therefore, because Petitioner was sentenced after <u>Apprendi</u> was decided, the holding in <u>Blakely</u> is applicable to his case.  (Mem. Supp. Pet. Writ Habeas Corpus  35-36.)   In support of his argument Petitioner cites to language from the Fourth Circuit opinion in <u>United States v. Hammoud</u>, 381 F.3d 316, 348 (4th Cir. 2004)(en banc), stating that "<u>Blakely</u> did not change – indeed, it reaffirmed – . . .  the rule of <u>Apprendi</u> . . . . [<u>Blakley</u>] adhered to the rule the Court announced in <u>Apprendi</u>."  (Mem. Supp. Pet. Writ Habeas Corpus  35.)  Petitioner also cites to a Colorado state appellate opinion and a Kansas Supreme Court opinion. (Mem. Supp. Pet. Writ Habeas Corpus  36 & n. 10; Pet'r's Resp. Mot. Summ. J. 58.)

Notably, Petitioner does not cite to clearly established Supreme Court precedent that supports his assertion that Blakely is not a new rule.[25] Moreover, this Court is unaware of any federal circuit court holding that Blakely is not a new rule. To the contrary, circuit courts that have addressed this issue have unanimously held that Blakely is a new rule of law. See e.g., United States v. Price, 400 F.3d 844, 848-49 (10th Cir. 2005)(holding that while Blakely interpreted Apprendi, it was not compelled by Apprendi, and thus a petitioner whose conviction became final post-Apprendi but pre-Blakely could not raise a Blakely claim on collateral review); Varela v. United States, 400 F.3d 864, 867 n.3 (11th Cir. 2005)(holding that Booker and Blakely's constitutional rules fall squarely under the category of new rules); Schardt v. Payne, 414 F.3d 1025, 1035-36 (9th Cir. 2005)(holding that Blakely did more than just apply Apprendi, it created a new rule that was not compelled by Apprendi or its progeny); Lloyd v. United States, 407 F.3d 608, 613 (3rd Cir. 2005)(noting that every court of appeals to decide the issue has held that Blakely and Booker set forth new rules). Such holdings support a conclusion that many reasonable jurists believed that Blakely was a new rule of constitutional criminal procedure.[26] See Butler v. McKellar, 494 U.S. 407, 415 (1990)(holding that a rule is not dictated by precedent

---

[25] Petitioner places great emphasis on the Supreme Court's language in Apprendi and the Fourth Circuit's language in Hammoud that states Blakely is an extension of Apprendi. Such language, however, is far from dispositive in the new rule analysis. See United States v. Morris, 429 F.3d 65, 70-71 n.7 (4th Cir. 2005)("[T]he fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under Teague.")(quoting Butler v. McKellar, 494 U.S. 407, 415 (1990)).

[26] As noted by the United States Court of Appeals for the Ninth Circuit, "[e]very circuit court of appeals that addressed the question presented in Blakely reached the opposite conclusion from the rule subsequently announced by the Supreme Court." Schardt v. Payne, 414 F.3d 1025, 1034 (9th Cir. 2005)(citing cases).

44

and is "new" if it was "susceptible to debate among reasonable minds"); Lambrix v,. Singletary, 520 U.S. 518, 527-28 (1997)(determining whether a rule was dictated by precedent by asking whether "the unlawfulness of [the] conviction was apparent to all reasonable jurists.")

In the alternative, Petitioner argues that Blakely is not a new rule because it is merely an extension of the Supreme Court's holding in Ring v. Arizona, 536 U.S. 584 (2002). (Mem. Supp. Pet. Writ Habeas Corpus 37.) The sole support Petitioner cites for this argument is language from the Blakely opinion. As already stated, such language is far from dispositive in the new rule analysis. See United States v. Morris, 429 F.3d 65, 70-71 n.7 (4th Cir. 2005)("[T]he fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under Teague.")(quoting Butler v. McKellar, 494 U.S. 407, 415 (1990)). Petitioner cites to no clearly established Supreme Court precedent to support his assertion that Blakley is merely an extension of Ring and therefore not a new rule. Consequently, Petitioner fails to establish that the MAR court unreasonably applied Supreme Court precedent when it held that Blakley was a new rule of criminal procedure.

Perhaps anticipating this result, Petitioner argues that even if the holding in Blakely is determined to be a new rule, such holding is a watershed decision and therefore pursuant to Teague v. Lane, 489 U.S. 288 (1989), is retroactively applicable on collateral review. (Mem. Supp. Pet. Writ Habeas Corpus 37-39.) In particular, Petitioner emphasizes that because Blakely addressed the level of the burden of proof as well as the identity of the fact finder, it is a watershed decision.

Again, Petitioner cites to no clearly established Supreme Court precedent concluding that

45

the Supreme Court's ruling in <u>Blakely</u> is a watershed rule that is retroactively applicable to cases on collateral review.[27] Indeed all indications are that <u>Blakely</u> is not retroactively applicable on collateral review. Every circuit court, including the Fourth Circuit, that has addressed whether the holdings of <u>Blakely</u> or <u>Booker</u>[28] are retroactive has determined that they are not.[29] See <u>e.g.</u>, <u>United States v. Morris</u>, 429 F.3d 65, 70, 72 (4th Cir. 2005)(<u>Booker</u> and <u>Blakey</u> are not watershed rules do not apply retroactively on collateral review); <u>Schardt v. Payne</u>, 414 F.3d 1025, 1036 (9th Cir. 2005)(Blakely is not a watershed rule and is not retroactively applicable on collateral review); <u>United States v. Price</u>, 400 F.3d 844, 848-49 (10th Cir. 2005)(<u>Blakely</u> is not a watershed rule and does not apply retroactively on collateral review); <u>Lloyd v. United States</u>, 407 F.3d 608, 614 (3rd Cir. 2005)(same); <u>Guzman v. United States</u>, 4040 F.3d 139, 143-44 (2d Cir. 2005)(same); <u>Valera v. United States</u>, 400 F.3d 864, 868 (11th Cir. 2005)(same); <u>Humphress v. United States</u>, 398 F.3d 855, 857 (6th Cir. 2005)(same); <u>McReynolds v. United States</u>, 397 F.3d 479, 481 (7th Cir. 2005)(same). As evidenced by the volume of case law holding to the contrary, the MAR court's ruling that <u>Blakely</u> was not retroactively applicable was not an unreasonable application of clearly established Supreme Court precedent.

---

[27] Indeed, this Court is unaware of, and Petitioner does not cite to even one federal court of appeals decision holding that the <u>Blakely</u> (or <u>Booker</u>) decision is retroactively applicable to cases on collateral review.

[28] The holding in <u>United States v.Booker</u>,543 U.S. 220 (2005), extended the holding in <u>Blakely</u>, which addressed state sentencing guidelines, to the Federal Sentencing Guidelines.

[29] Surprisingly, Petitioner chooses to cite to cases from other state courts rather than federal cases addressing this precise issue.

**THEREFORE, IT IS HEREBY ORDERED** that:

1. Respondent's Motion for Summary Judgment is **GRANTED**; and

2. Petitioner's Petition for Writ of Habeas Corpus is **DISMISSED**.

Signed: February 25, 2009

Graham C. Mullen
United States District Judge

.

47